STATE OF HAWAII, Plaintiff-Appellee, *v.* MICHAEL PATRICK WARD AND GILBERT MADRID, Defendants-Appellants, and ERNEST KEUMA, Defendant

NO. 6790

SEPTEMBER 24, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM, JJ., AND RETIRED JUSTICE KOBAYASHI ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY LUM, J.

This is an appeal by defendants-appellants Michael Patrick Ward and Gilbert Madrid, who were convicted by a

circuit court jury for carrying firearms on their persons without permits.[1] They contend that the trial court erred in denying their pre-trial motions to suppress incriminating evidence collected by the police through a warrantless telescopic search. The substance of their contention is that the police, without probable cause, conducted a telescopic surveillance (search) of activities in their apartment from a distance from which such activities were not visual to the naked eye, thereby violating their reasonable expectation of privacy in contravention of their constitutional rights.[2] We agree and reverse their convictions.

I.

At about 12:30 a.m. on December 11, 1976, Officer Melvin Nakapaahu of the Honolulu Police Department received an anonymous telephone call reporting that a gambling game was occurring in Apartment 707 of a building located at 620 McCully Street. Upon instruction, he went to the Royal Aloha Hotel, which was located approximately one-eighth of a mile from the apartment building and secured a vantage point on the fourteenth floor. Although the record is not explicit, presumably the hotel provided the officer the closest available view from which he can see through the uncurtained windows of Apartment 707.

---

[1] Section 134-9 of the Hawaii Revised Statutes provides, in relevant part, that:

No person shall carry concealed or unconcealed on his person a pistol or revolver without being licensed so to do under this section or in compliance with section 134-6.

.　　.　　.　　.

Any person violating this section shall be imprisoned for a term of not less than two years nor more than five years, without probation.

[2] Appellants argue that the binocular search violated constitutional protections guaranteed under the fourth amendment of the United States Constitution and article I, section 7 of the Hawaii State Constitution.

With the aid of a set of 10x30 magnification binoculars,[3] the officer observed the activities in the seventh-floor apartment for about an hour. He saw fifteen people situated about "a blue felt cloth"; dollar bills placed on the cloth; dice were rolled and a "stickman" apparently distributing the moneys won and lost. The officer concluded that an illegal crap game was taking place and at about 2:00 a.m. called for additional policemen. The squad of officers proceeded to the apartment where the gamblers were taken into custody and handguns were seized from the defendants.

## II.

Appellants first contend that the anonymous informant's "tip" was insufficient to constitute the probable cause for the warrantless search conducted by the police through the use of the high-powered binoculars.

We agree with appellants that the anonymous telephonic tip received by the police that a gambling operation was in progress in Apartment 707 without more is insufficient to support a finding of probable cause to conduct the search. Our conclusion is easily reached as the record is devoid of any of the underlying circumstances from which the officer can conclude that the informant was credible and his information reliable, and is devoid of any of the underlying circumstances which explain how the informant knew that appellants were committing a crime. *Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969); *State v. Delaney*, 58 Haw. 19, 563 P.2d 990 (1977); *State v. Davenport*, 55 Haw. 90, 516 P.2d 65 (1973).

The failure of the State to support the record with underlying facts to sustain probable cause is reflective of the government's basic argument that the police did not conduct a search pursuant to the informant's tip.

---

[3] Binoculars are measured by an "AxB" term. "A" represents the linear magnification (*i.e.*, the number of times larger an object looks when compared with the naked eye view) and "B" tells the diameter of each object glass (*i.e.*, the front lens on a set of binoculars), in millimeters.

In this regard, appellants and the government take divergent views as to whether a search was in fact conducted by the police. The State asks this court to conclude that the binocular observation was not a search. It argues that such observation involved no physical trespass or entry by the police; that appellants exhibited no expectation of privacy by their failure to draw the apartment curtains or place any obstruction to protect the privacy of their apartment; and a fortiori, what was seen through the use of the binoculars was in open view, *State v. Kaaheena*, 59 Haw. 23, 575 P.2d 462 (1978). And, that "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *State v. Stachler*, 58 Haw. 412, 570 P.2d 1323 (1977), and *Katz v. United States*, 389 U.S. 347 (1967).

Appellants remonstrate that the police did conduct a search by the use of the high-powered binoculars. The activities within their apartment could not be seen by the officers with their naked eye but could only be seen with the use of the visual optic aid; therefore, the activities were not in open view, and the use of the binoculars by the police was an intrusive and unreasonable conduct which violated appellants' reasonable expectation of privacy.

### III.

On previous occasions we have considered cases involving police use of binoculars to conduct warrantless observations and surveillance.

In *State v. Dias*, 52 Haw. 100, 470 P.2d 510 (1970), we struck down a warrantless telescopic surveillance conducted by the police as being a search which violated defendant's reasonable expectation of privacy. Police were staked out approximately 150-200 yards away from where narcotic violators were conducting activities on a privately owned property — a passageway between two apartment houses. Presumably their activities were observable only with the use of the visual optic aid. The passageway was in open view; nothing was done to shield their activities. In suppressing the narcotics which were later found, this court stated: "While

the space between the apartments was open to the plain view of the officer, it was not open to unlimited governmental intrusions such as the search which ensued." *Id.* at 106, 470 P.2d at 514. "Since the passageway was located on private property, the group which met and socialized there had every expectation of freedom from governmental intrusion as to the premises and the protection of the fourth amendment therefore applies." *Id.* at 107, 470 P.2d at 514.

In *State v. Stachler, supra,* this court upheld an aerial observation when the police used binoculars to see a marijuana patch from a helicopter. The court ruled that no search occurred because the marijuana patch was in open view; therefore, defendant had no reasonable expectation of privacy. Contrarily, in *State v. Kender,* 60 Haw. 301, 588 P.2d 447 (1978), this court found that it was unreasonable search when the police, acting without a warrant, climbed a fence to get above a natural barrier of California grass to discover marijuana plants in the defendant's backyard with the aid of binoculars. It found that defendant had exhibited a reasonable expectation of privacy by allowing the grass to grow above eye level.

However, in none of these cases was the specific issue of *aided* vision addressed. The novel issue presented here concerns the propriety of a warrantless telescopic surveillance by the police of an area expressly protected by the constitution. Although the investigating officer was rightfully situated, his view of the incriminating evidence was not accessible to the naked eye but only by means of binoculars.

Courts which have been confronted with a similar fact pattern have divided dramatically in their application of Justice Harlan's two-pronged test — that a person exhibit an actual (subjective) expectation of privacy and that the expectation be one that society is prepared to recognize as reasonable. A number of these courts have applied the test in a literal manner. That view was best expressed in the case of *Commonwealth v. Hernley,* 216 Pa.Super.Ct. 177, 263 A.2d 904 (1970), *cert. denied,* 401 U.S. 914 (1971), which was one of the earliest decisions to address the pertinence of *Katz* to a binocular investigation. There an FBI agent suspected that

illegal gambling forms were being produced in a particular printshop. To verify his suspicions, the agent mounted a ladder and peered through the shop's elevated window with the aid of a pair of binoculars. He saw that the suspect was, indeed, printing illegal parlay sheets.

The Pennsylvania court upheld the agent's actions by a strict reading of Harlan's test. The court simply applied the first branch of the test and concluded that the suspect had no actual expectation of privacy. It reasoned that to preserve his privacy from visual observation it was incumbent on the suspect to curtain his windows: "The law will not shield criminal activity from visual observation when the actor shows such little regard for his privacy." *Id.* at 182.

This rigid application of the Harlan test has been followed in a number of other jurisdictions. See *Commonwealth v. Williams*, 396 A.2d 1286 (Pa. 1978) (upholding police use of an instrument (*i.e.*, a scantron) to peer through an uncurtained window and see into areas too dark for the naked eye to discern); *People v. Hicks*, 49 Ill.App.3d 421, 364 N.E.2d 440 (1977) (upholding police observations through undrawn curtains, even though the suspect had twice before pulled them while the police were watching with binoculars); *State v. Thompson*, 196 Neb. 55, 241 N.W.2d 511 (1976) (upholding binocular observations by the police through drawn sheer curtains); *State v. Manly*, 85 Wash.2d 120, 530 P.2d 306 (1975) (upholding police use of binoculars to look into a second-story apartment to confirm an officer's unaided perception that plants resembling marijuana were being kept therein).

The government in this case urges us to follow this line of cases and apply the strict rule to the Harlan test. We choose not to do so. We choose not to depart from our previous rulings.

In *Dias*, defendant's activities, by comparison with this case, were actually out in the open. The passageway, although a private property, was accessible to the public and defendants did nothing to hide their activities. And yet we chose, and we believe rightfully so, to liberally construe the expectation-of-privacy test.

In *Kender*, at 304, 588 P.2d at 450, we explained our views of that test:

[A] number of factors must be considered among which are the location of the premises, that is, whether in an urban or isolated area, existence or nonexistence and height of natural or artificial structures adjacent to the premises, the height and sight proof character of the fencing, the location of public or common private walkways adjacent to the premises, the type and character of invasion by the governmental authority, *and other unforseeable (sic) factors which will arise on a case by case basis.* (Emphasis added.)

We believe that considering all factors on a case-by-case basis will produce fairer results.

Our position is not without support. In *United States v. Kim*, 415 F.Supp. 1252 (D. Hawaii 1976), evidence obtained by government agents through the warrantless use of a telescopic aid was excluded.

In that case, FBI agents, acting without a warrant, used binoculars to investigate suspected gambling activities occurring in the defendant's apartment. From a building located one-quarter of a mile away, the agents were able to see through uncurtained windows into the apartment's interior. There they saw the defendant making numerous telephone calls while reading from a sports journal. These observations confirmed the agents' belief that the defendant was operating a "telephone spot" for a major gambling operation.

The court found that defendant's expectation of privacy was reasonable. It posited two factors as dispositive. First, the government's systematic scrutiny was possible only with the aid of binoculars and, second, although a private citizen could have likewise spied on the defendant, the fourth amendment's circumscription of official investigative conduct holds law enforcement officers to higher standards.

Two subsequent cases dealing with similar situations have reached similar results. In *People v. Arno*, 90 Cal.App.3d 505, 153 Cal.Rptr. 624 (1979), the Court of Appeal for the Second District noted:

We conclude: (1) the use of optical aids in the nature of

binoculars, telescopes and the like is not itself determinative of the admissibility in evidence of the product of the observation; (2) the primary determinative factor is the presence or absence of a reasonable expectation of privacy of the person whose conduct, property, or documents is observed; (3) reasonable expectation of privacy in the context here involved is tested by the extent to which the person has exposed his conduct, property, or documents to public view *by the naked eye*; (4) if the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid, there is no unconstitutional intrustion; and (5) *if the purpose of the optical aid is to view that which could not be seen without it, there is*. (Emphasis added.)

*Id.* at 509, 153 Cal.Rptr. at 625-26.

Similarly, in the recent case of *United States v. Taborda*, 27 Crim.L.Rep. 2324 (July 16, 1980), the District Court for the Eastern District of New York stated:

If government agents are required to obtain a warrant before listening with a sophisticated monitoring device, one would suppose that the same requirement should apply to watching with a sophisticated telescope. . . . This court reads the Katz case to mean, as a minimum, that the people may demand privacy unless a policeman can see or hear them from a place accessible to those members of the public not preternaturally inquisitive. . . . That this is the purport of the opinion seems clear from the fact that it excludes from the protection of the Fourth Amendment only what "a person knowingly exposes to the public."

*Id.* at 2324 and 2325.

We conclude that appellants did not conduct their activities within their apartment to public view by the naked eye; that they had a reasonable expectation of privacy, and that the use of the binoculars by the police constituted an unconstitutional search.

Appellants' apartment was located at a height above street levels and at a distance from other buildings so that

what transpired therein was not exposed to the naked eye. It was reasonable for appellants to expect their actions to be private.

The State contends that appellants failed to exhibit any expectation of privacy because they left the window uncovered. We do not believe, under the circumstances of this case, appellants were required to do so. The constitution does not require that in all cases a person, in order to protect his privacy, must shut himself off from fresh air, sunlight and scenery. And as a collorary, neither does the constitution hold that a person, by opening his curtains, thereby opens his person, house, papers and effects to telescopic scrutiny by the government.

We find that the police officer's use of the binoculars as an optic aid was unreasonable and intruded upon appellants' reasonable expectation of privacy. No one can doubt that telescopic aids are useful investigative tools in the hands of law enforcement officers. Sophisticated optical aids permit the police to peer into secret places from great distances without a suspect knowing that his movement is being watched. But, if the purpose of the telescopic aid is to view that which could not be seen without it, it is a constitutional invasion.

To permit the police to view whatever a curious observer could with binoculars would eviscerate our constitutional protection. Given probable cause, the police can always apply to a neutral judge to obtain a warrant to conduct a telescopic search.

Reversed.

*Brook Hart (Peter C. Wolff, Jr.,* with him on the reply brief, *Hart, Leavitt & Hunt* of counsel), for defendants-appellants.

*Arthur E. Ross (Faye M. Koyanagi* on the brief), Deputy Prosecuting Attorneys, for plaintiff-appellee.