## STATE OF HAWAII, Plaintiff-Appellee, *v.* RICHARD L. NAKACHI, Defendant-Appellant

NO. 11293

(CRIMINAL NO. 85-0527)

AUGUST 14, 1987

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C. J.

Defendant Richard L. Nakachi (Nakachi) appeals the February 18, 1986 judgment convicting him of two counts of terroristic

threatening in the second degree in violation of Hawaii Revised Statutes (HRS) § 707-717(1) and one count of possession of a firearm in violation of HRS § 134-6.[1] We affirm.

The issues and our answers are as follows:

I. Does the record contain sufficient evidence to support a finding of Nakachi's guilt of terroristic threatening without a dangerous instrument? Yes.

II. Did the order by the police requiring Nakachi to exit the automobile violate Nakachi's right under the Hawaii State Constitution to be secure against unreasonable seizures? No.

I.

Nakachi contends that the trial court reversibly erred when it allowed the jury to find him guilty of the included offense of terroristic threatening in the second degree. We disagree.

HRS §§ 707-715(1), 707-716(1) (d), and 707-717(1) provide as follows:

§ 707-715 Terroristic threatening, defined. A person commits the offense of terroristic threatening if he threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

[§ 707-716] Terroristic threatening in the first degree. (1) A person commits the offense of terroristic threatening in the first degree if he commits terroristic threatening:

*   *   *

(d) With the use of a dangerous instrument.

[§ 707-717] Terroristic threatening in the second degree. (1) A person commits the offense of terroristic threatening in the second degree if he commits terroristic threatening other than as provided in section 707-716.

---

[1] On August 26, 1985 Nakachi pleaded guilty to one count of failing to register a pistol or revolver in violation of HRS § 134-2(b) and one count of acquiring a firearm without a permit in violation of HRS § 134-3. The handgun involved in those two counts is the same handgun involved in the three counts in this appeal.

Viewed in a light favorable to the prosecution, the relevant facts are as follows. While working on the sixth floor of the Kaiser Hospital (hospital), at about 8:30 p.m. on April 8, 1985, Susan Nacnac (Nacnac) and Ruth Lagana (Lagana), both nurses, heard a disturbance below in the metered public parking lot on the southwest side of the hospital building between it and the Ala Wai yacht harbor. They walked to the balcony, looked down, and saw and heard a man and a woman engaged in a verbal and physical conflict. The woman was yelling for help. The man obtained an object from a handbag. Nacnac and Lagana thought it was a gun. He pointed it up toward them. In terror they ran back into the building.

Others with better vantage points than Nacnac and Lagana saw Nakachi point what they thought was a gun up toward them and yell, "What are you fuckers looking at[?] I will blow you away, you fuckers. I will get you." Nakachi admitted that he was angry at all the people in the hospital who were watching; that he pointed his finger toward the people in the hospital; and that he loudly yelled, "What the fuck are you guys looking at, you fuckers?"

The prosecution charged that, in violation of HRS § 707-716(1) (d), "RICHARD L. NAKACHI threatened, by word or conduct to cause bodily injury to [Nacnac and Lagana], with the use of a dangerous instrument, to wit, a .32 caliber revolver in reckless disregard of the risk of terrorizing" Nacnac and Lagana.

Over Nakachi's objection, the trial court instructed the jury that if it did not find Nakachi guilty as charged of terroristic threatening in the first degree, it must decide whether Nakachi was guilty of the included offense of terroristic threatening in the second degree.

The jury first found Nakachi not guilty of terroristic threatening in the first degree and then guilty of terroristic threatening in the second degree. In other words, the jury found that Nakachi threatened by word or conduct but not with the use of a dangerous instrument[2] to cause bodily injury to Nacnac and Lagana in reck-

[2] HRS § 707-700(4) provides, " 'Dangerous instrument' means any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury[.]"

less disregard[3] of the risk of terrorizing them.

Unquestionably, terroristic threatening in the second degree can be an offense included[4] within terroristic threatening in the first degree. Nakachi contends that there is insufficient evidence in the record to support the giving of an included offense instruction in this case. The issue is whether there was a rational basis in the evidence for a verdict acquitting Nakachi of terroristic threatening with a dangerous instrument and convicting him of terroristic threatening without a dangerous instrument. HRS § 701-109(5) (1985);[5] *State v. Sneed*, 68 Haw. ____, 718 P.2d 280 (1986). There is no rational basis unless the record contains sufficient evidence to support a finding of guilt of terroristic threatening without a dangerous instrument. *Sneed*, 68 Haw. at ____, 718 P.2d at 282 (1986). Consequently, the issue we face is the same issue we would be facing if Nakachi were appealing the denial of his Rule 29(c), HRPP, post-trial motion for judgment of acquittal of the included offense. 2 Wright, Federal Practice and Procedure: *Criminal 2d*

---

[3] HRS § 702-206(3) provides:

(3) "Recklessly."
(a) A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk by engaging in such conduct.
(b) A person acts recklessly with respect to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.
(c) A person acts recklessly with respect to a result of his conduct when he consciously disregards a substantial and unjustifiable risk that his conduct will cause such a result.
(d) A risk is substantial and unjustifiable within the meaning of this section if, considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation.

[4] HRS § 701-109(4) (a) provides, "A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when: (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]"

[5] HRS § 701-109(5) (1985) provides:

The court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.

§ 467 (1982); *see State v. Halemanu,* 3 Haw. App. 300, 650 P.2d 587 (1982).

Nakachi notes (a) that Nacnac and Lagana did not hear him threaten them, (b) could not identify him as the person who terrorized them, and (c) that, in the absence of Nakachi's use of a dangerous instrument, their terror was unreasonable. What Nakachi fails to note, however, is that (a) and (b) are not material elements of terroristic threatening in the second degree. Those elements are as follows: (1) By words or conduct Nakachi threatened Nacnac and Lagana, (2) to cause them bodily injury (3) in reckless disregard of the risk of terrorizing them. Actual terrorization is not a material element although it is evidence of the occurrence of the material elements. Clearly, there is substantial evidence in the record for elements 1 and 2. The question is whether upon the evidence a reasonable jury might fairly conclude that Nakachi uttered his threats in reckless disregard of the risk of terrorizing Nacnac and Lagana. *See State v. Halemanu,* 3 Haw. App. at 304, 650 P.2d at 591 (1982).

HRS § 702-206(3) (a) provides, "A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk by engaging in such conduct." The question here is whether the risk that Nakachi's conduct would terrorize Nacnac and Lagana was "substantial and unjustifiable."

HRS § 702-206(3) (d) provides, "A risk is substantial and unjustifiable within the meaning of this section if, considering the nature and purpose of the person's conduct and the circumstances known to him, the disregard of the risk involves a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation." Given those definitions, we conclude in Nakachi's case that the trial court rightly determined that a reasonable jury might fairly conclude that Nakachi acted recklessly by consciously disregarding a substantial and unjustifiable risk. Thus, there was a rational basis for the trial court to give the included offense instruction. *State v. Sneed, supra.*

## II.

Nakachi contends that the trial court reversibly erred in denying his Rule 12(b)(3), Hawaii Rules of Penal Procedure (HRPP),

motion to suppress the handgun as evidence because the discovery of the handgun by the police resulted from the violation of his right under art. 1, sec. 7 of the Hawaii State Constitution to be secure against unreasonable seizures.[6] We disagree.

Viewed in a light favorable to the prosecution, the relevant facts are as follows.[7] While on patrol in Waikiki on April 8, 1985, at about 8:30 p.m., Officer Mark Victor (Officer Victor) received a call from dispatch stating that an anonymous caller[8] reported a domestic type argument in progress in the Kaiser Hospital parking lot. He and Officer Darren Asuncion (Officer Asuncion) responded to the call. Each officer was operating a Cushman three-wheel motorcycle. As Officer Victor approached the parking lot, persons in passing automobiles informed him that "it's over there and it's happening in a blue VW or a blue bug". Officer Victor drove toward the blue Volkswagen automobile, parking his motorcycle behind the automobile in a position that blocked the automobile from leaving. His intent was to prevent the occupants from leaving.

Officers Victor and Asuncion approached the driver's side of the automobile and noticed a male in the driver's seat and a female in the passenger's seat. The automobile's engine was off. The male, who was later identified as Nakachi, and the female, who was later identified as Terri Daily (Daily), continued to yell and swear at each other. Officer Victor smelled alcohol about Nakachi. Daily seemed very upset and was crying uncontrollably. Nakachi told Officer .

---

[6] Nakachi did not renew his objection when the handgun was introduced in evidence at the trial. Such a renewal is advisable but not required. *See* 3 Wright, Federal Practice and Procedure: *Criminal 2d,* § 678 (1982); 1 Wright, Federal Practice and Procedure: *Criminal 2d,* § 193 (1982); *contra, State v. Lesley,* 672 P.2d 79 (Utah 1983).

[7] When reviewing this issue, we consider all the evidence received at the motion to suppress hearing and at the trial. *State v. Uddipa,* 3 Haw. App. 415, 651 P.2d 507 (1982); 3 Wright, Federal Practice and Procedure: *Criminal 2d* § 678 (1982). Moreover, we view the factual disputes in the record in a light favorable to the party that prevailed on the motion to suppress. *See* 3 Wright, Federal Practice and Procedure: *Criminal 2d* § 678 (1982).

[8] The prosecutor did not introduce evidence of whether or not the caller identified himself or herself. Therefore, for purposes of this case, the caller was anonymous.

Victor that he and Daily were having an argument, he was angry, he wanted to be left alone, and he wanted to leave.

Officer Victor walked over to the passenger's side of the automobile and noticed that Daily was still crying and seemed drunk, and her shirt was torn about the neck area. Officer Victor tried to calm Daily. Officer Asuncion tried to calm Nakachi. Officer Victor did not observe any crime being committed, but he thought "there may have been[,] looking at the condition of the woman". Although Daily did not complain or want to file a complaint, she did not respond to Officer Victor's question whether she was afraid of Nakachi and wanted to exit the automobile.

Several minutes after arriving at the scene, Officer Victor received a second call from dispatch stating that a caller[9] reported an argument in progress at the parking lot on the Diamond Head side (southeast) of the hospital building between it and the Ilikai Marina condominium building and said a gun was involved. Officer Victor testified, "[T]he call stated that arguing [sic] was in the Diamond Head parking lot, not the same parking lot that we were in. So I presumed that this was another separate case." Officer Victor asked dispatch to send more officers since he was busy.

After receiving the second call, Officers Victor and Asuncion continued their attempt to calm the parties, who appeared to be getting angrier. Nakachi started the automobile's engine, shifted it into reverse gear, and threatened to ram Officer Victor's motorcycle that was blocking his way.

Officer Victor testified:

> Shortly afterward, it occurred to me that the two calls could be one and the same, an argument in the Kaiser Hospital parking lot. And taking heed of the second call where a gun may be involved, I realized that this may be the case. And I signaled Officer Asuncion over the roof of the car that the man and woman may have a gun and the gun may be in the car.
>
> *   *   *
>
> My concern was that there was a gun somewhere near or in the car.

---

[9] The prosecutor did not introduce evidence of whether or not the caller identified himself or herself. Therefore, for purposes of this case, the caller was anonymous

When asked what caused him to conclude that the two calls concerned the same incident, Officer Victor testified, "Just that there was a second call on the first call and plus they seem[ed] to be more agitated or more wanting to leave."

While Nakachi and Daily were still in the car, other police officers arrived. Officer Carvalho was informed by Officer Victor about the two calls and the possibility that a gun may be in the car. Soon thereafter, Officer Carvalho asked Nakachi to get out of the car and Officer Victor asked Daily to do the same, which they did. After the automobile's doors were opened, they remained open.

As Daily alighted from the car, Officer Victor grabbed her purse and squeezed it to see if there was a gun inside. He did not feel a gun in the purse. After Nakachi stepped out of the automobile, he was frisked.

Subsequently, Officer Chang arrived and was informed that a weapon had been involved. He stepped up to the driver's side of the car and used the light from his flashlight to help him see inside. He noticed a handgun wedged between the driver's seat and the floor board on the left side of the seat. Officer Chang would not have been able to see the handgun had the automobile door been closed. We do not know if the light from Officer Chang's flashlight helped him to notice the gun or if the gun was visible without the aid of the light from his flashlight.

After overhearing Officer Victor's request on the radio for assistance, Sergeant Robert Naylor proceeded to the Kaiser Hospital parking lot. Sergeant Naylor arrived at the scene after Nakachi and Daily had already been ordered out of the car. Sergeant Naylor walked up to the driver's side of the automobile and observed the gun next to the driver's seat. After he ascertained that Daily owned the car, he obtained her written consent allowing the police to search the car. He thereafter took possession of the handgun.

Officer Victor testified that, upon encountering a "domestic", it was proper police procedure to try to separate the parties, calm them down, and check to see if any offenses were committed.

The prosecution concedes that Nakachi and Daily were ordered out of the automobile by the police. That order was a warrantless seizure of Nakachi and Daily. *State v. Joao,* 56 Haw. 216, 533 P.2d 270 (1975). Since the handgun came into view as a consequence of the seizure of Nakachi, if the seizure were unconstitutional, the

lower court reversibly erred when it denied Nakachi's motion to suppress the handgun as evidence. *Id.* Consequently, the question is whether the order requiring Nakachi to exit the automobile violated Nakachi's right under art. 1, sec. 7 of the Hawaii State Constitution to be secure against unreasonable seizures. Our answer is no.[10]

In *State v. Kim,* 68 Haw. ____, 711 P.2d 1291 (1985), the Hawaii Supreme Court held that when an automobile has been validly stopped for a traffic violation the police may not order the driver who is not being validly arrested to exit the automobile unless they have a reasonable basis of specific articulable facts to believe that the driver has been driving while under the influence of intoxicating liquor (DUI) in violation of HRS § 291-4. Here, since the police officers did not claim to have ordered Nakachi out of the automobile on suspicion of DUI, *Kim* is inapposite.

The officers testified that they ordered Nakachi and Daily to exit the automobile because (1) they feared that there was a handgun in the automobile and (2) it is police procedure upon encountering a domestic dispute to try to separate the disputants.

Reason (2) is insufficient justification for the order to exit because the police are not authorized to order domestic disputants to separate except as specified in HRS § 709-906(4)[11] and the prosecution does not contend that the officers were acting under HRS § 709-906(4).

---

[10] This appeal does not present us with the questions (1) whether the police, after requiring an automobile occupant to open the automobile's door and to exit the automobile, may require that person to leave the automobile's door open, thereby affording the police for an extended period an expanded and enhanced view of the contents of the automobile; (2) whether Officer Victor's and Chang's viewings of the interior of the automobile with the aid of the light from their flashlights were constitutionally permissible; and (3) how long it was constitutionally permissible for the police to detain Nakachi and Daily.

[11] HRS § 709-906(4) provides:

Any police officer may, with or without a warrant, take the following course of action where the officer has reasonable grounds to believe that there was recent physical abuse or harm inflicted by one person upon a family or household member, whether or not such physical abuse or harm occurred in the officer's presence:

   (a) The police officer may make reasonable inquiry of the family or household member upon whom the officer believes recent physical abuse or

With respect to reason (1), in *Joao,* the Hawaii Supreme Court held that when an automobile has been validly stopped, the police may not order a person occupying an automobile who is not being validly arrested to exit the automobile unless the facts known to the police would warrant a person of reasonable caution to believe that the occupant is armed and dangerous and that the action taken is appropriate. *State v. Joao,* 56 Haw. at 221, 533 P.2d at 274. The articulable facts known to Officer Carvalho[12] at the time he ordered Nakachi to exit the automobile were as follows: (a) an anonymous caller had reported to the police that a domestic argument was occurring in the Kaiser Hospital parking lot; (b) the anonymous caller's information was verified by the police and the argument was between Nakachi and Daily in the parking lot on the southwest side of the hospital building; (c) Nakachi and Daily probably had consumed alcoholic beverage; (d) Nakachi was very angry at the police for detaining him; (e) Nakachi had threatened to facilitate his departure from the scene by applying the force of his automobile against the police motorcycle that had been positioned to prevent his departure; (f) an anonymous caller had reported to the police that an argument was occurring in the parking lot on the nearby southeast side of the hospital building and that a gun was involved; and (g) the two anonymous caller reports were probably about the same argument.

---

harm has been inflicted and other witnesses as there may be; and

(b) Where the police officer has reasonable grounds to believe that there is probable danger of further physical abuse or harm being inflicted by one person upon a family or household member, the police officer may lawfully order such person to leave the premises for a cooling off period of twelve hours; and

(c) If the person so ordered refuses to comply with the order to leave the premises or returns to the premises before the expiration of twelve hours, the person shall be placed under arrest for the purpose of preventing further physical abuse or harm to the family or household member.

[12] With respect to searches, the following two rules apply: (1) Among peace officers working together and keeping each other informed, the knowledge of each is the knowledge of all, *State v. Pokini,* 45 Haw. 295, 367 P.2d 499 (1961); and (2) by imputation, the knowledge of a police officer who is working under the directions of another police officer includes the knowledge of the directing police officer, *State v. Pestana,* 59 Haw. 375, 581 P.2d 758 (1978). These two rules also apply with respect to seizures.

The question is whether these facts would cause a person of reasonable caution to believe objectively that (1) Nakachi was then armed and dangerous and (2) it was appropriate to order Nakachi out of the automobile. *State v. Joao,* 56 Haw. at 221, 533 P.2d at 274 (1975). Our answer is yes.

When deciding these questions, we consider the ordering police officer's reliable knowledge[13] of the defendant and the attendant circumstances. *State v. Barnes,* 58 Haw. 333, 568 P.2d 1207 (1977). We weigh the evidence constituting the whole picture "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981).

If the reliability of the second anonymous caller's information were indisputable, and the conclusion by the police that the two reports involved the same argument were indisputable, then the reasonableness of the order would also be indisputable. Thus, the questions are, (1) How reliable was the second anonymous caller's information? (2) Was that information sufficiently reliable? (3) How reliable was the conclusion by the police that the two reports were about the same argument? and (4) Was that conclusion sufficiently reliable? Our answers are (1) fairly reliable, (2) yes, (3) very reliable, and (4) yes.

In *State v. Phillips,* 67 Haw. 535, 696 P.2d 346 (1985), the Hawaii Supreme Court stated in relevant part as follows:

> Yet, an anonymous tip "is devoid of any of the underlying circumstances from which [an] officer can conclude that the informant was credible and his information reliable." *State v. Ward,* 62 Haw. 509, 511, 617 P.2d 568, 570 (1980). Moreover, the anonymous tip here "is devoid of any of the underlying circumstances which explain how the informant knew [the suspect was] committing a crime." *Id.* Without more, a faceless informer's tip does not give cause for the forcible stop of a person, let alone the search of his car. *See State v. Temple,* 65 Haw. 261, 271, 650 P.2d 1358, 1364 (1982); *State v. Joao,* 55 Haw. 601, 603-04, 525 P.2d 580, 582-83 (1974).

67 Haw. at 540, 696 P.2d at 350.

---

[13] *See* footnote 11.

In *State v. Ward,* 62 Haw. 509, 617 P.2d 568 (1980), the Hawaii Supreme Court stated in relevant part as follows:

> We agree with appellants that the anonymous telephonic tip received by the police that a gambling operation was in progress in Apartment 707 without more is insufficient to support a finding of probable cause to conduct the search. Our conclusion is easily reached as the record is devoid of any of the underlying circumstances from which the officer can conclude that the informant was credible and his information reliable, and is devoid of any of the underlying circumstances which explain how the informant knew that appellants were committing a crime. *Aguilar v. Texas,* 378 U.S. 108 (1964); *Spinelli v. United States,* 393 U.S. 410 (1969); *State v. Delaney,* 58 Haw. 19, 563 P.2d 990 (1977); *State v. Davenport,* 55 Haw. 90, 516 P.2d 65 (1973).

62 Haw. at 511, 617 P.2d at 570.

*Phillips* and *Ward* preclude anonymous tips from being the sole articulable facts justifying an order by the police requiring an automobile occupant to exit a stopped automobile. They do not preclude anonymous tips from being contributing articulable facts.

The record does not reveal whether or not the two calls were from the same person. Both anonymous callers reported an incident in progress as opposed to one that had previously occurred or was to occur in the future. The record does not reveal whether the callers personally viewed what they reported or how they knew what they reported. The record does not reveal whether or not they refused to disclose their identity or why they were anonymous.

On the other hand, the police had verified the first caller's information and, when they reasonably concluded that the two calls were about the same incident, they verified the first of the two parts of the second caller's information.

Moreover, we are not reviewing a warrantless search of an auto as in *Phillips, supra,* or a warrantless search of an apartment with binoculars as in *Ward, supra.* We are reviewing a police order requiring Nakachi to exit his automobile while the police performed their duty and investigated the possibility of his criminal activity. The police gave the order because they had been informed that Nakachi or his passenger personally possessed a handgun. Based on the totality of the circumstances, it was reasonable for them to

fear for their own personal safety and for the safety of others nearby.

Affirmed.

*Philip D. Bogetto* for defendant-appellant.

*G. Cher Foerster,* Deputy Prosecuting Attorney, for plaintiff-appellee.