994 P.2d 509

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Robin C. KLINGE, Defendant–Appellant**

**No. 21237.**

Supreme Court of Hawai'i.

Feb. 4, 2000.

Reconsideration Denied March 10, 2000.

Rose Anne Fletcher, Deputy Public Defender, on the briefs, for defendant-appellant.

Simone C. Polak, Deputy Prosecuting Attorney, (Bridget Y. Palmer, Law Associate Justice Clerk assisting on the brief) on the briefs, for respondent-appellee.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

Defendant-appellant Robin C. Klinge (Klinge) appeals from the second circuit court's judgment, guilty conviction, and sentence filed December 3, 1997. On October 1, 1997, a jury found Klinge guilty of terroristic threatening in the first degree in violation of Hawai‘i Revised Statutes (HRS) § 707–716(1)(b) (1993).[1] On appeal, Klinge con-

1. HRS § 707–716(1)(b) provides: **Terroristic threatening in the first degree.**

tends that: (1) his constitutional right to a unanimous verdict was violated because the requisite mental states with respect to the results of the prohibited conduct under HRS § 707–715[2] gave rise to separate crimes; and (2) the trial court erred in failing to grant his motion for mistrial based on prosecutorial misconduct. We hold that (1) Klinge's constitutional right to a unanimous verdict was not violated inasmuch as HRS §§ 707–715(1) and (2) do not give rise to two separate and distinct crimes; and (2) The trial court did not abuse its discretion in denying Klinge's motion for mistrial based on prosecutorial misconduct. Accordingly, we affirm the circuit court's judgment, guilty conviction and sentence filed on December 3, 1997.

## I. BACKGROUND

On April 22, 1997, the prosecution filed a complaint against Klinge charging the offense of terroristic threatening in the first degree. Following a jury trial, Klinge was found guilty as charged and sentenced to serve a five-year term of probation, subject to a one-year term of incarceration as a special condition of probation. The following facts were adduced at trial and are relevant to the issues in this appeal.

### A. Jury Selection/Voir Dire

During jury selection, the circuit court initially questioned the prospective jurors whether they could wait until deliberation before deciding whether Klinge was guilty beyond a reasonable doubt of the offense charged. Likewise, during voir dire, defense counsel focused on the court's instruction that the jurors should keep an open mind. During voir dire of Juror Nettleship, the prosecutor noted, "Based upon the evidence that comes before you at trial. You can

decide whatever you want to, but as far as deliberation, you wait until the end." The prosecutor also stated, "[t]he evidence you hear in the trial you are going to make your own decision individually on that. You can start deciding whenever you want to decide." The circuit court immediately sustained defense counsel's objections to the prosecutor's remarks. Following jury selection, the circuit court again instructed the jurors that they must wait until the commencement of deliberations before determining whether the defendant was guilty or not guilty.

### B. The Churches and Schools

#### 1. March 21, 1997—Church of Jesus Christ of Latter Day Saints

William Riedel (Riedel), a licensed general contractor, testified that, on March 21, 1997, he was working with his construction crew at the Church of Jesus Christ of Latter Day Saints (LDS) in Kahului, Maui. While working at the LDS, Riedel noticed a long cylindrical object approximately one foot in length near the LDS satellite dish. Riedel described the object as being two inches in diameter, with wooden spoons taped across it. As Riedel picked up the object, he noticed that the object had what appeared to be green wire wrapped lengthwise around the object and foil tape attached at the ends with coins underneath.

Riedel testified that he had previously received intensive three-day training with dynamite and demolition work. Based on his training, Riedel became suspicious of the object and placed it back down. Thereafter, Riedel called the police because he and his crew agreed that the object "pretty much looked like a bomb."

(1) A person commits the offense of terroristic threatening in the first degree if he commits terroristic threatening:
. . .
(b) By threats made in a common scheme against different persons[.]

**2.** HRS § 707–715 provides:
**Terroristic threatening, defined.** A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to

cause bodily injury to another person or serious damage to property of another or to commit a felony:
(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or
(2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.

Maui police officers Jeffrey Mahoney (Officer Mahoney) and Guy Souza (Officer Souza) responded to Riedel's call. Upon their arrival, neither Officer Mahoney nor Officer Souza went near the object. Instead, the officers secured a perimeter around the area where the object was located. Riedel and his crew were not allowed to return to the area where the object had been found and were instructed to stay three hundred feet away.

Officer Cedric Zumwalt (Officer Zumwalt) also responded to Riedel's call. Officer Zumwalt testified that his responsibility at the LDS church was to secure the scene, make sure no one was in the building, and seal off the area. Officer Zumwalt also testified that he observed the object from a distance of six to eight feet because the object "was kind of scary looking." Officer Zumwalt decided to call in a bomb squad from Honolulu because the object appeared to be "some type of explosive device, some kind of bomb or something." According to Officer Zumwalt, the object was one foot in length, two inches in diameter, and covered in plastic with a nylon cord wrapped lengthwise around it.

United States Army Staff Sergeant Timothy James Choulat (Sgt. Choulat), of the Sixth Explosive Ordinance Disposal Unit (EODU) at Schofield Barracks, testified that he received a request from the Maui Police Department, on March 21, 1997, to have a team ascertain whether a suspicious item was actually an explosive device. Upon arrival, Sgt. Choulat expanded the evacuation area and ordered the closure of a nearby street. Sgt. Choulat recalled that he first thought the cylindrical object was made of piping material that is commonly used in explosive devices. After taking Polaroid shots and x-rays of the object, Sgt. Choulat and his team determined that the object was not an explosive device.

### 2. *March 29, 1997—Christ the King School*

Sister Julia Acain (Sister Julia), who resided at the convent on the campus of Christ the King School in Kahului, recounted that, on March 29, 1997, she observed an object shaped like a cylinder, about ten inches in length, in the yard near the convent. Noting that the object was wrapped in foil with a dollar bill, Sister Julia testified that she did not touch the item because "it looked scary" and that "[i]t was frightening because it looked suspicious." Sister Julia called the police shortly thereafter.

Officer Greg Alejo of the Maui Police Department testified that he and the other responding officers evacuated the convent and closed off adjoining streets. The residents of the convent were not allowed to remain on the school's premises or return to the convent. According to Officer Alejo, he did not touch the item because he "didn't trust it" and "did not want to loose [sic] ... [an] arm or anything like that." Officer Alejo further testified that two other objects were located on the campus in the playground area. Both objects consisted of a sandwich bag containing a tampon applicator with coins wrapped around it and a dollar bill attached to the blue wire that was used to close the sandwich bag.

Again, the Maui Police Department called in a bomb squad from Honolulu. Sergeant Joseph Allen Latham (Sgt. Latham) of the Army EODU testified that, although x-rays were taken of the item, he was unable to determine whether the object was an explosive device. Sgt. Latham opened the package remotely, using a direct blast to one end of the object. Once the object was opened, Sgt. Latham saw that the object consisted of a rolled up magazine with a couple of keys in it.

### 3. *March 31, 1997—Christ the King Church*

Sister Angie Laurenzo (Sister Angie) testified that, on the morning of March 31, 1997, before the start of the school day, she proceeded to the school restrooms to unlock them before the arrival of the students. As Sister Angie entered the girls' restroom, she observed the following items on the floor: a few money bills with stick figures drawn on them, a cigarette lighter with coins taped to it, a tampon, an object that looked like a plastic eggshell, and a flower. Sister Angie testified that she remembered hearing on the radio about bomb threats and that this was frightening to her, especially because of the lighter. Sister Angie did not touch anything

and called the police. The police recovered the items from the floor without evacuating the building or calling in a bomb squad.

### 4. *April 4, 1997—Saint Anthony's High School*

Sister Sarah Sanders (Sister Sarah), a teacher at Saint Anthony's High School, testified that, on April 4, 1997, although school was not in session on that day, she was at the school feeding fish. After Sister Sarah had fed the fish, Aida Negre, a school custodian, asked Sister Sarah to go to the girls' restroom. According to Sister Sarah, Negre seemed frightened and wanted to show her something that she had found there.

In the restroom, Sister Sarah observed a black object lying on the floor, but did not go near it because "the object appeared to be a small bowl shaped piece with something sticking off the top ... and two wires crossed in front." Sister Sarah also saw that the upper portion of the object was wrapped by United States currency bills. Based on her observations, Sister Sarah believed that the item was an explosive device and thereafter secured the restroom.

Brother Jim Dods (Brother Jim), principal of Saint Anthony's High School, testified that he was asked by Negre and Sister Sarah to inspect the item that had been found in the restroom. Because he was aware of the bomb-like item found at Christ the King School, because the item was bundled with wires, and because of other incidents on campus, Brother Jim did not touch the item. According to Brother Jim, the object appeared to be something dangerous. Brother Jim immediately called the police.

Upon arrival of the fire and police department officials, Officer Paul Bailey inspected the item and secured the building where the object was found. Officer Bailey described the item as suspicious, "appear[ing] to be ... the black top of a power steering unit with two wires sticking out of it and it was wrapped in a dollar bill." The wires "were not connected to each other[,] and they were not connected to anything else." In his report, Officer Bailey wrote that the item resembled an explosive device.

Lieutenant Trung Phan, of the Army EODU, testified that he and another team member performed an x-ray of the device. After he did not see anything suspicious from the x-ray images, Lt. Phan removed the item "remotely" with his equipment and pulled the item apart. Lt. Phan explained that the item was made up of a couple dollar bills held tightly to a brake fluid cap by rubber bands and a couple of wires.

Other items were found at Saint Anthony's at various times throughout February and March 1997. These items included: (1) a wrench with four one-dollar bills tied tightly around it with a shoe string; (2) a pencil with a dollar tied tightly around it by a string or ribbon; (3) a package containing a plastic toy gun, a dollar bill, coins, a hair "scrunchie," and a nail; (4) another package containing a video cassette of a Mercury Tracer automobile, a yellow Alamo Rent–a–Car sticker, a booklet, a map, an envelope, a bracelet, a sign, a sealed tampon, dollar bills, white paper, and a magazine page of nude women; and (5) yet another package containing a card, audio cassette, a Susan B. Anthony dollar, and a "pornographic" picture.

### C. *Klinge's Testimony*

Klinge testified that for approximately one-year he had been leaving objects at various churches. While cleaning cars at his job at Alamo Rent–a–Car, he would find toys and other items, tie money around the items, and throw the items in various church yards on the way home on his bike. Klinge "felt no harm could come by throwing money in the church[,]" that he always attached money to the items as offerings, and that either the church or the kids would find the money and someone would make use of it. He also testified that, because he was a little superstitious, he would make a wish when he left the "offerings" at the churches.

Klinge further testified that some of the magazines he had left had been sent back to him because his subscription labels were still on the magazines. When asked on cross-examination about his reason for leaving the tampons, Klinge testified that he attached them so that God would take notice of his offerings.

According to Klinge, he did not know that he was scaring people until the police detectives informed him as such on April 7, 1997. Klinge stated that "when I found out that I was scaring the people at the church I felt bad" because he had not intended to frighten them. When questioned whether he knew that the people at the church would be upset by the tampons and pictures of nude women, Klinge replied that it did not bother him that children would look at the pictures and that, in any event, he "didn't think it would scare 'um.'" Klinge further stated that his purpose in leaving the objects was to tease the churches.

### D. Jury Instructions and Closing Arguments

Following the presentation of evidence, Klinge requested, in connection with the verdict form, that the verdict be divided between either "terrorizing" or "evacuation" for purposes of unanimity to prove the requisite state of mind for terroristic threatening in the first degree. The circuit court denied Klinge's request, stating that the unanimity instruction was sufficient.

During the prosecution's closing argument, the prosecutor made the following statement: "What this case is all about is this: The people's safety is the highest law. That's what this is all about, the people's safety is the highest law." Following defense counsel's closing argument, the prosecutor, on rebuttal, made the following statement:

The defense lawyer did not tell you that like he's taking everything out of context like he's not going to give you the whole story. He's not going to give you the whole picture because he has a duty [to] get his client off.

The court sustained defense counsel's objection to this remark and ordered the remark stricken.

Klinge later moved for a mistrial based upon prosecutorial misconduct, arguing that during rebuttal, the prosecution misstated the facts, misstated the law, misstated defense counsel's closing argument, and also "cast disparaging dispersions on [defense counsel's] professionalism." The circuit court admonished the prosecution, but denied Defendant's motion.

## II. STANDARDS OF REVIEW

### A. Jury Instructions

■ "'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.'" *State v. Ortiz*, 91 Hawai'i 181, 190, 981 P.2d 1127, 1136 (1999) (quoting *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted))). *See also State v. Hoey*, 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Sawyer*, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citing *State v. Robinson*, 82 Hawai'i 304, 922 P.2d 358 (1996)).

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to the conviction.

*State v. Tabigne*, 88 Hawai'i 296, 302, 966 P.2d 608, 614 (1998) (citations omitted). If there is a reasonable possibility that error might have contributed to a conviction in a criminal case, then the error cannot be harmless beyond a reasonable doubt, and the conviction must be set aside. *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997) (citations omitted).

### B. Constitutional Questions

■ We review questions of constitutional law "by exercising our own independent constitutional judgment based on the facts of the case." *State v. Rogan*, 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999) (quoting *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)) (quoting *State v. Trainor*, 83 Hawai'i

250, 255, 925 P.2d 818, 823 (1996), and *State v. Lee*, 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996)). Accordingly, we review questions of constitutional law de novo under the "right/wrong" standard. *State v. Mallan*, 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998) (citation omitted).

### C. Statutory Interpretation

" '[T]he interpretation of a statute ... is a question of law reviewable de novo.' " *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (quoting *Arceo*, 84 Hawai'i at 10, 928 P.2d at 852 (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted))).

### D. Motion for Mistrial

"The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion." *Rogan*, 91 Hawai'i at 411, 984 P.2d at 1237 (citing *State v. Loa*, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (quoting *State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting *State v. Furutani*, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994))).

### E. Prosecutorial Misconduct

"Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of 'whether there is a reasonable possibility that the error complained of might have contributed to the conviction.' " *Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting *State v. Balisbisana*, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting *State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied*, 80 Hawai'i 187, 907

P.2d 773 (1995))) (citations and internal quotation marks omitted). "Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." *Id.* (quoting *State v. Samuel*, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

### F. Plain Error

"We may recognize plain error when the error committed affects substantial rights of the defendant." *Kotis*, 91 Hawai'i at 329, 984 P.2d at 88 (quoting *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (citations and internal quotation signals omitted). *See also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

### III. DISCUSSION

A. *Klinge's constitutional right to a unanimous verdict was not violated inasmuch as HRS §§ 707–715(1) and (2) do not give rise to two separate and distinct crimes.*

Klinge first contends that his constitutional right to a unanimous verdict was violated because HRS §§ 707–715(1) and 707–715(2) give rise to two separate and "inherently different" offenses. Klinge specifically alleges that, because the two means of proving the "intent element" [3] of terroristic threatening under HRS §§ 707–715(1) and 707–715(2) do not implicate "notions of equivalent blameworthiness or culpability," the trial court erred in failing to issue an instruction guaranteeing unanimity as to either "intent." We disagree.

Under HRS § 702–205 (1993), "[t]he elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense[.]" Moreover, HRS § 701–114(1) (1993) requires proof beyond a

---

**3.** Klinge refers to the requisite intent as an "element" of the crime. However, under HRS § 702–205, state of mind is not an "element" of a criminal offense. *See* HRS § 702–205 ("[t]he

elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense[.]")

reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense. *See State v. Wallace*, 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (quoting *Holbron*, 80 Hawai'i at 39, 904 P.2d at 924 (citations omitted)). In addition, HRS § 702–207 provides that "[w]hen the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, *the specified state of mind shall apply to all elements of the offense*, unless a contrary purpose plainly appears." (Emphasis added.) *See also Wallace*, 80 Hawai'i at 412, 910 P.2d at 725 (citation omitted).

Terroristic threatening in the first degree under HRS § 707–716(b) is the act of "committing terroristic threatening ... by threats made in a common scheme against different persons." HRS § 707–715 defines the offense of "terroristic threatening" as follows:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or

(2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.

*See supra* note 1. The defining statute establishes the offender's conduct as a "threat[ ], by word or conduct" to (1) cause bodily injury, (2) cause property damage, or (3) commit a felony. It also describes two alternative, and equally culpable, states of mind applicable to that conduct: (1) the intent to terrorize, or in reckless disregard of the risk of terrorizing; or (2) the intent to cause, or in reckless disregard of the risk of causing evacuation. *See also* commentary to Model Penal Code (MPC) § 211.3 [4] ("Section 211.3

of the Model Penal Code states a general proscription of threat of violence made in order to terrorize another *or* to cause serious public inconvenience.") (Emphasis added); *State v. Pukahi*, 70 Haw. 456, 458, 776 P.2d 392, 393 (1989) ("in the case of terroristic threatening, [a] threat becomes a crime only when it is coupled with[, *inter alia* ], an intent to terrorize, or a reckless disregard of the risk of terrorizing").

As this court emphasized in *State v. Chung*, 75 Haw. 398, 413, 862 P.2d 1063, 1071 (1993), " '[a]ctual terrorization *is not a material element* ' of the offense of terroristic threatening." (quoting *State v. Nakachi*, 7 Haw.App. 28, 32, 742 P.2d 388, 391 (1987)) (emphasis added). In fact, to be subject to prosecution for terroristic threatening, a defendant need not communicate the threat directly or indirectly to the target of the threat, but may communicate it to a third party. *Id.* at 412, 862 P.2d at 1071 (citing *State v. Meyers*, 72 Haw. 591, 594, 825 P.2d 1062, 1064 (1992) ("a person making threats does not commit a crime until the threat is heard by one other than the speaker"). Simply put, the offender *need not cause a result. See also* commentary to MPC § 211.3 (the MPC provision does not require an element of apprehension in the victims but only that the actor's purpose be to "terrorize" or "cause evacuation of a building").

In the instant case, the trial court instructed the jury with regard to the offense of terroristic threatening in the first degree as follows:

A person commits the offense of terroristic threatening in the first degree, if with intent to terrorize, or in reckless disregard of the risk of terrorizing another person, and/or with intent to cause or in reckless disregard of the risk of causing the evacuation of a building, place of assembly, or facility of public transportation by threats made in a common scheme against different persons, he did threaten by word or conduct to cause bodily injury to another

---

4. MPC § 211.3 provides:

A person is guilty of a felony of the third degree if he threatens to commit any crime of violence with purpose to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience.

person or serious damage to the property of another.

There are five material elements of the offense of terroristic threatening in the first degree each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That during or about the period of March 21, 1997, through April 7, 1997;

2. In the County of Maui, State of Hawai'i;

3. [Defendant] ...;

4. In a common scheme against different persons[;]

5. Threatened, by word or conduct, to cause bodily injury to another person or serious damage to property of another:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or

(2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.

■ Klinge maintains that, based upon this instruction, the trial court gave the jury a choice between two separate and distinct crimes because HRS §§ 707–715(1) and 707–715(2) do not share in common the same elements (ie., the same prohibited act and result of the act). To the contrary, the enumerated statutory alternatives under HRS § 707–715(1) and (2)—intent to terrorize or reckless disregard of terrorizing a person and intent to cause evacuation or reckless disregard of evacuation of a building—refer to alternative means of satisfying the mens rea component of the offense of terroristic threatening.

In *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), a plurality of the United States Supreme Court made plain that, consistent with the due process clause, a state court may determine that "certain statutory alternatives are mere means of committing a single offense, rather

than as independent elements of the crime." *Id.* at 636, 111 S.Ct. 2491. The plurality reasoned that, under Arizona law, neither premeditation nor intent to commit a felony is an independent element of first degree murder; rather, they are merely alternative means of satisfying the mens rea element of the crime. *Id.* at 637, 111 S.Ct. 2491. Upholding the Arizona Supreme Court's determination that Arizona's first degree murder statute did not create two distinct crimes of murder, the plurality concluded that a separate verdict specifying felony murder was unnecessary. *Id.* at 636, 111 S.Ct. 2491. *See also United States v. Navarro,* 145 F.3d 580 (3d Cir.1998) (unanimity instruction with regard to defendant's mental state was not required where defendant violated money laundering statute enumerating three possible intents); *State v. St. Pierre,* 693 A.2d 1137 (Me.1997) (defendant was not entitled to a unanimous verdict on the purpose for which he engaged in sexual contact; only one crime was involved, regardless of whether sexual contact occurred "for the purpose of arousing or gratifying sexual desire" or "for the purpose of causing bodily injury or offensive physical contact."); *State v. Luster,* 48 Conn.App. 872, 713 A.2d 277, 280 (1998) (Because intent to commit assault and intent to commit sexual assault gave rise to the same criminal culpability for burglary in the first degree, unanimity regarding the defendant's intent was not required); *James,* 698 P.2d at 1167 ("where the alleged criminal deed is restricted to a single incident, any potential difference in the jurors' findings of intent versus wilful disregard is not significant when jurors unanimously agree upon the defendant's guilt of the crime").

■ While *Schad* is not controlling, its analysis and reasoning are particularly persuasive here. Although the plurality refused to adopt any bright line rule, it set forth a test for determining whether alternative mental states merely constitute a means of satisfying a single mens rea element, or instead create separate crimes requiring individual proof.[5] The appropriate test under

---

5. Other jurisdictions that have examined the issue of juror unanimity have set forth various tests to determine whether a criminal statute

describes and proscribes a single offense or multiple offenses. In *United States v. UCO Oil Co.,* 546 F.2d 833 (9th Cir.1976), the United States

*Schad* appears to be whether the level of verdict specificity required by the instructions was rational and fair, considering history and practice, and the degree of "blameworthiness and culpability." *Schad,* 501 U.S. at 637, 111 S.Ct. 2491.

The first prong looks to "history and wide practice as guides to fundamental values." *Id.* In this regard, Klinge maintains that, inasmuch as the alternatives enumerated in HRS § 707–715(1) and (2) have distinct foci and were enacted to address two distinct concerns, the two constitute separate and distinct crimes requiring a unanimous verdict as to which crime was committed. That the legislature had slightly different reasons in mind when enacting HRS § 707–715(1) and (2) does not alone evince legislative intent to treat those subsections as constituting two distinct crimes of terroristic threatening. Nor does it negate the fact that either alternative gives rise to the same criminal offense. In our view, Klinge's approach "rests on the erroneous assumption that any statutory alternatives are *ipso facto* independent elements defining independent crimes ... and [are] therefore subject to the axiomatic principle that the prosecution must prove independently every element of the crime." *Schad,* 501 U.S. at 636, 111 S.Ct. 2491.

Klinge also fails to cite any "substantial historical and contemporary echoes" to support its holding that a unanimity instruction is necessary where a statute enumerates equivalent alternate means of satisfying the mental state element. Although HRS § 707–715 lacks an expansive statutory history, this jurisdiction's case law and contemporary practice confirm that HRS § 707–715(1) and (2) do not create independent elements defining separate crimes. *See State v. Burdett,* 70 Haw. 85, 88, 762 P.2d 164, 167 (1988) ("terroristic threatening requires a mental state that is intentional or reckless."); *State v.*

*Alston,* 75 Haw. 517, 540–41, 865 P.2d 157, 169 (1994); Commentary on HRS § 707–715 (referring to the provision in the singular as "this section" and "the offense"); MPC § 211.3 (setting forth substantially similar language as HRS § 707–715).

Moreover, the general principle that juries need not agree on alternative means of establishing the mental state component possessed by the defendant is well established and widely recognized. *See, e.g., Sullivan v. Borg,* 1 F.3d 926 (9th Cir.1993) (instruction allowing jury to convict defendant of first degree murder without unanimity as to whether he had committed felony murder or premeditated murder did not violate due process), *certiorari denied,* 510 U.S. 1096, 114 S.Ct. 931, 127 L.Ed.2d 223 (1994); *Luster,* 713 A.2d at 280 (because intent to commit assault and intent to commit sexual assault give rise to the same criminal culpability for burglary in the first degree, unanimity regarding the defendant's intent was not required); *State v. Smith,* 170 Wis.2d 701, 490 N.W.2d 40 (App.1992) (jurors need not unanimously agree that defendant acted with the "purpose to cause a fire or that he acted with an awareness that his conduct was practically certain to cause that result" because the two were alternative means in which intent is manifested under the state arson statute), *certiorari denied,* 507 U.S. 1035, 113 S.Ct. 1860, 123 L.Ed.2d 481 (1993); *State v. Bey,* 129 N.J. 557, 610 A.2d 814, 826 (1992) (because knowing murder and purposeful murder are equivalent expressions of moral culpability, jury need only agree unanimously that defendant's state of mind was either purposeful or knowing); *State v. Fortune,* 128 Wash.2d 464, 909 P.2d 930 (1996) (defendant's due process rights were not violated by his being convicted of first-degree murder without having unanimous jury finding as to

Court of Appeals for the Ninth Circuit articulated four factors as follows: "(1) the language of the statute itself; (2) the legislative history; (3) the nature of the proscribed conduct (whether statute describes distinctly different kinds of conduct); and (4) the appropriateness of multiple punishment for the conduct charged in the indictment." *Id:* at 835–37. *See also State v. James,* 698 P.2d 1161, 1165 (Alaska 1985) (adopting the test in *UCO Oil* ). Similarly, in

*State v. Arndt,* 87 Wash.2d 374, 553 P.2d 1328 (1976), the Washington Supreme Court set forth the factors as follows: "(1) the title of the act; (2) whether there is a readily perceivable connection between the various acts set forth; (3) whether the acts are consistent with and not repugnant to each other; and (4) whether the acts may inhere in the same transaction." *Id.* at 1331.

which of two alternative means, premeditated or felony murder supported conviction); *People v. Brown,* 35 Cal.App.4th 708, 41 Cal. Rptr.2d 321 (1995) (jury was not required to unanimously agree on its theory of malice in finding defendant guilty of second degree murder); *Navarro,* 145 F.3d 580 (failure to give specific unanimity instruction with regard to mental state required to establish money laundering offense was not plain error); *State v. Buckman,* 237 Neb. 936, 468 N.W.2d 589 (1991) (following *Schad* ); *People v. Davis,* 8 Cal.App.4th 28, 10 Cal.Rptr.2d 381 (1992) (California courts do not require that jurors unanimously agree on the theory of criminal culpability supporting their unanimous conclusion of guilt); *Pierre,* 693 A.2d at 1139 (unanimity instruction was not required regarding purpose for which defendant engaged in sexual conduct); *State v. Russell,* 733 P.2d 162, 167 (Utah 1987) (refusal to give requested instruction that jury had to unanimously agree upon one of three statutory sections regarding mens rea did not deny defendant's right to unanimous jury verdict in second-degree murder trial, where statute defined only one crime); *State v. Salazar,* 123 N.M. 778, 945 P.2d 996 (1997) (jury need not be unanimous on one of the alternate theories of first degree murder).

The second prong of the *Schad* analysis asks whether HRS § 707–715(1) and (2) "reasonably reflect notions of equivalent blameworthiness or culpability." *Schad,* 501 U.S. at 643, 111 S.Ct. 2491. Whenever "it is clear that such equivalence could reasonably be found," alternative means should be allowed to satisfy the mental element of a single crime. *Id.* at 644, 111 S.Ct. 2491. *See also Luster,* 48 Conn.App. 872, 713 A.2d 277, 280 ("In situations where 'the alternatives of the mens rea [intent] component give rise to the *same criminal culpability,* it does not appear

critical that the jury may have reached different conclusions regarding the nature of the defendant's intent if such differences do not reflect disagreement on the facts pertaining to the defendant's conduct.") (Brackets in original.) (Citation omitted and emphasis added.)

In the instant case, the second prong of the *Schad* standard is clearly satisfied.[6] We perceive no practical difference in culpability between intent to terrorize a person and intent to evacuate a building. It is clear from the definition of the offense that it is directed at a single evil—the "threat" committed with a criminally culpable mental state.

HRS § 707–715(1) "addresses conduct causing serious alarm for personal safety." Commentary on HRS § 707–715. HRS § 707–715(2) "addresses conduct disrupting public services or activities" and the *"attendant dangers"* involved. *Id.* (emphasis added). The level of culpability between the two alternatives is not morally disparate in any significant sense. That the intent to terrorize involves apprehension or fear on the part of the recipient while the intent to cause evacuation may not,[7] is unpersuasive. Either alternative gives rise to the same criminal culpability. It is of little consequence, therefore, that some jurors may have believed that Klinge was guilty of terroristic threatening in the first degree based on one alternative while others may have believed he was guilty based on another, as long as such differences did not reflect disagreement on the facts pertinent to Klinge's conduct. *See Arceo,* 84 Hawai'i at 33, 928 P.2d at 875 (requiring juror unanimity regarding defendant's conduct).[8] As the dissent itself acknowledges,

6. We note, however, that there may be instances where two mental states do not "reasonably reflect notions of equivalent blameworthiness or culpability," thereby requiring an election or unanimity instruction. This, however, is not such a case.

7. It is true, as the dissent notes, that not all evacuees experience fear in response to a command to evacuate. However, the evacuation of a building in almost all situations involves fear on the part of at least some of the evacuees.

8. The jurors apparently unanimously agreed on the facts pertaining to the Klinge's conduct. At trial, the trial judge provided the following unanimity instruction to the jury regarding Klinge's conduct: " 'All 12 jurors must unanimously agree that the same underlying criminal act or acts have been proved beyond a reasonable doubt.' "

the two alternatives will, in many cases, be coextensive.[9]

Given the intricacy of the law and complexity of criminal conduct, Klinge's approach would, as a practical matter, prove instructionally unworkable, cause needless confusion, and create absurd results. Under the approach advanced by Klinge, the jury presumably should have been required to unanimously find one of each of the following alternatives: that Klinge threatened by "word *or* conduct, to cause bodily injury to another person *or* serious damage to property of another *or* to commit a felony," and that Klinge performed the act "with the intent to terrorize *or* in reckless disregard of the risk of terrorizing," *or* "with intent to cause *or* in reckless disregard of the risk of causing evacuation." (Emphasis added.) Indeed, "[h]ow far up the trunk and branches of the evidence tree must this unanimity extend?" *Russell*, 733 P.2d at 171 (Stewart, J., concurring) (citation omitted).

Article I, sections 5[10] and 14[11] of the Hawai'i Constitution prescribe the outer limits of required verdict specificity. The instruction read in this case clearly comports with our well-established notions of due process. This case deals only with alternative means of satisfying the mental state with regard to each element of the offense, not with alternative courses of conduct. It matters little, therefore, that the jury may have reached different conclusions regarding the nature of Klinge's purpose at the time he "committt[ed] terroristic threatening ... by threats made in a common scheme against different persons" even though the legislature may have had different reasons for enacting the two provisions. The threatening conduct is what the law prohibits. Either intent gives rise to the same conduct and, therefore, the same crime.

We are unpersuaded by Klinge's contention that a single scheme of terroristic threatening in violation of HRS § 707–716(b) gives rise to independent elements defining separate crimes simply because it was possible that he committed it with two different purposes. We hold instead that HRS § 707–715 defines a single criminal offense. We further hold that HRS § 707–715(1) and (2) constitute alternative means of establishing the mens rea of the offense of terroristic threatening—either one giving rise to the *same criminal culpability*. Accordingly, the trial court in this case did not err in its instruction to the jury.[12]

B. *The trial court did not abuse its discretion in denying Klinge's motion for mistrial based on prosecutorial misconduct.*

Klinge argues that the trial court erred in failing to grant his motion for mistrial based on prosecutorial misconduct. On October 1, 1997, defense counsel orally moved for a mistrial, alleging that the prosecutor

not only misstated the facts, misstated the law, misstated what I said, but [ ] also cast disparaging dispersions on my profession-

9. The dissent recognizes that the two alternatives "are not mutually exclusive (i.e., a defendant may simultaneously intend to terrorize a person and to cause an evacuation)[.]"

10. Haw. Const. art. I, § 5 provides:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

11. Haw. Const. art I, § 14 provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district where-in the crime shall have been committed, which district shall have been previously ascertained by law, or of such other district to which the prosecution may be removed with the consent of the accused; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against the accused; to have compulsory process for obtaining witnesses in the accused's favor; and to have the assistance of counsel for the accused's defense. Juries, where the crime charged is serious, shall consist of twelve persons. The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment.

12. We limit our decision to this proposition and do not express any opinion on the necessity of unanimity in other situations not present in this case.

alism. I.e., [sic] I only give this defense because I have to.

Furthermore, he told the jury to do the right thing and not let him walk away like he did from the police, which is discussing punishment.

In denying Klinge's motion for mistrial, the trial court ruled, "I did sustain your objection on at least one of those points, and I would caution you, [prosecutor], that I will not in future trials permit that to continue. But I don't think that the damages are warranted to support a mistrial."

On appeal, Klinge alleges that the prosecutor committed the following acts of misconduct: (1) questioning the jury on the issue of "legal insanity" during jury selection where it was not a defense in the case, and "revisiting the issue of legal insanity during jury selection immediately after being instructed to move on"; (2) informing a juror in the presence of the entire panel during jury selection that the juror was free to reach a conclusion individually regarding the defendant's guilt at any time during the trial; (3) questioning a witness with regard to a matter which would require speculation of a fact bearing on a material issue in the case; (4) during closing argument, misinstructing the jury that "the peoples' safety is the highest law"; (5) arguing to the jury that defense counsel concocted the defense of lack of state of mind because he had a "duty [to] get his client off"; and (6) during rebuttal closing argument, misinstructing the jury on the material elements of the offense of terroristic threatening.[13] We address each argument in turn.

▇▇▇ It is a well-settled principle in this jurisdiction that

[a]llegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting State v.

*Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995)) (citations and internal quotation marks omitted); *see also State v. Sanchez*, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), *cert. denied*, 84 Hawai'i 127, 930 P.2d 1015 (1996) (citation omitted). Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. *State v. Samuel*, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

*Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238. Misconduct of a prosecutor may provide grounds for a new trial where there is a reasonable possibility that the misconduct complained of might have contributed to the conviction. *Id.* However, under the double jeopardy clause of article I, section 10 of the Hawai'i Constitution, "reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial." [14] *Id.* at 423, 984 P.2d at 1249 (holding that "reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial.")

1. *Questioning the jury on the issue of "legal insanity" during jury selection*

▇▇▇ Klinge first argues that the prosecutor committed misconduct by asking a prospective juror during jury selection about "legal insanity" where insanity was not a defense at trial. He alleges specifically that such questioning tended to cast Klinge's character in a "negative light." The prosecutor's line of questioning occurred as follows:

[PROSECUTION]: Now, there's one last law I want to talk about and it is a law that you are not going to hear, but a law that you may have in the back of your minds.

---

13. It is unclear from the trial transcript which instances of prosecutorial misconduct were included in Klinge's motion for mistrial.

14. We note that Klinge does not argue on appeal that the prosecutor's alleged misconduct clearly denied him a fair trial so as to bar reprosecution.

You are going to be hearing or viewing evidence. Throughout the course of the trial there will be a lot of evidence. It is going to be evidence that the police collected. It will be statements from people that take the stand and testify. You may reach a conclusion in your minds that hey, this person might be legally insane and that's what I am going to bring up, legal insanity.

[DEFENSE COUNSEL]: I'll object to that. That is not going to be a defense.

[PROSECUTION]: I want to make sure it is not, and these people—

THE COURT: I'll sustain the objection. Let's go on, Mr. Rivera.

[PROSECUTION]: You can only follow the law the Judge will give you. If the law—if the Judge does not provide a law on legal insanity, then that is something you cannot consider.

[DEFENSE COUNSEL]: Your Honor, same objection.

THE COURT: Sustained. Let's move on, Mr. Rivera.

We are unpersuaded that the prosecutor's questions regarding "legal insanity" amounted to prosecutorial misconduct. The trial court promptly sustained defense counsel's immediate objections. Moreover, during the prosecution's second comment, the prosecutor correctly stated that the jurors could "only follow the law the judge [gave them]." As such, the prosecution's line of questioning was, in our view, merely an attempt to explore the prospective jurors' ability to follow the law and to disregard matters not before them. Accordingly, we hold that this remark did not constitute prosecutorial misconduct.

2. *Advising a juror during jury selection that the juror was free to reach a conclusion individually regarding Klinge's guilt at any time during the trial*

Klinge next asserts that the prosecutor engaged in misconduct by advising a juror that she was free to make an independent decision regarding Klinge's guilt at any time during the trial. During voir dire, while the prosecutor questioned a potential replace-ment juror in the presence of the other jurors, the following exchange occurred:

[PROSECUTOR]: Now, the defense lawyer has been asking everything [sic] to wait until the end until they decide. You understand the law is you are going to have to wait until the end to deliberate together as a group?

[PROSPECTIVE JUROR]: Yes.

[PROSECUTOR]: Based upon the evidence that comes before you at trial. *You can decide whatever you want to, but as far as deliberation, you wait until the end.* You are not to talk to anyone else.

[DEFENSE COUNSEL]: I don't believe that's correct. I don't believe anyone on this jury can think they can decide this case before they enter—

THE COURT: I'm sorry. Hold on. I know. Rephrase, please, Mr. Rivera.

[PROSECUTOR]: Your Honor, I am talking about the law here. Do you understand at the end—you are all not to get—until the end of the case when the case is turned over to you none of you are to get together and deliberate until the end? You understand that?

[PROSPECTIVE JUROR]: Yes.

[PROSECUTOR]: The evidence you hear in the trial you are going to make your own decision individually on that. *You can start deciding whenever you want to decide.*

THE COURT: That's not correct.

[PROSECUTOR]: You are not going to give—

THE COURT: That's not correct. We will wait. I don't want you to decide the case until you have heard all of the evidence and my instructions and arguments of counsel.

(Emphases added.)

 Based on this colloquy, we agree that the prosecutor's statement that the prospective juror could "start deciding whenever [she] ... want[ed] to decide[ ]" was a clear misstatement of the law. Indeed, the prosecutor's statement in essence gave the jury license to decide the question of Klinge's guilt at any time, independent of the evidence presented, the arguments of counsel,

and the trial court's instructions to the jury.[15] Nonetheless, the trial court's prompt admonishment to the jury to wait until it "heard all of the evidence[, the court's] instructions[,] and arguments of counsel" adequately corrected any misconceptions that may have been conveyed to the jury. "As a rule, juries are presumed to ... follow all of the trial court's instructions." *State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) (quoting *Sato v. Tawata*, 79 Hawai'i 14, 21, 897 P.2d 941, 948 (1995)).

Therefore, in light of the court's curative instruction, the prosecutor's isolated statement did not amount to prosecutorial misconduct.

### 3. *Misinstructing the jury that "the people's safety is the highest law" during closing argument*

■ Klinge next contends that the following statement by the prosecutor during closing argument constituted prosecutorial misconduct: "What this case is all about is this: The people's safety is the highest law. That's what this is all about, the people's safety is the highest law." Inasmuch as Klinge failed to object to the foregoing statement, we must determine whether the prosecutor's alleged misconduct in uttering this remark amounted to plain error which affected the substantial rights of the defendant. *See Ganal*, 81 Hawai'i at 376, 917 P.2d at 388 (citing Hawai'i Rules of Penal Procedure, Rule 52(b); (citing *State v. Marsh*, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986)).

During closing argument, a prosecutor is "permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence." *Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997) (quoting *State v. Clark*, 83 Hawai'i 289, 304, 926 P.2d 194, 209, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (citations omitted))). *See also Marsh*,

68 Haw. at 660, 728 P.2d at 1302 (during closing argument, the prosecution may argue "on his [or her] analysis of the evidence, for any position or conclusion" with respect to the justness of a cause, the credibility of a witness, or the guilt or innocence of the accused"). "In other words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom." *Rogan*, 91 Hawai'i at 413, 984 P.2d at 1239 (citing *Quitog*, 85 Hawai'i at 145, 938 P.2d at 576). Moreover,

> [t]he prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office.

*Id.* at 413, 984 P.2d at 1239 (quoting ABA Prosecution Function Standard 3–5.8).

■ In the instant case, we believe that the prosecutor's statement constituted prosecutorial misconduct inasmuch as it was both inappropriate and erroneous. To be sure, the prosecutor's remark could have "divert[ed] the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law." *State v. Apliando*, 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995) (citation omitted). We therefore admonish the prosecution for suggesting that "the people's safety" eclipses all other law. However, in light of the fact that defense counsel failed to object at trial, and the trial court later instructed the jury "concerning the law which [it] must follow in arriving at [its] verdict" and cautioned the jury that

---

**15.** In its answering brief, the prosecution "concedes that the prosecutor erred in advising the

juror that she could begin to decide at any point."

"[s]tatements or remarks made by counsel are not evidence," we are unable to conclude that the statement prejudicially affected Klinge's substantial rights.

Further, in light of the strength of the evidence against Klinge, this statement taken in context does not reach the level of reversible error. At trial, the evidence with respect to conduct was not in dispute. Klinge admitted that he had placed the objects at the various places on the dates in question. With regard to the issue of intent, Klinge's defense essentially hinged upon Klinge's testimony. As discussed above, Klinge testified that he did not know that he was scaring people until the police informed him as such on April 7, 1997. He further stated that he and had not intended to frighten people. He instead claimed that his purpose in leaving the objects was to tease the churches.

The prosecution's case, on the other hand, primarily hinged upon photographs of the actual objects, testimony by citizens who had discovered them, and the testimony of the police officers who had investigated the incidents. For example, William Riedel, who discovered one of the objects, testified that he called the police after discovering one of the items because he and his crew agreed that it "pretty much looked like a bomb." Sister Julia later testified that she did not touch one of the objects because "it looked scary" and "[i]t was frightening because it looked suspicious."

While the evidence in this case was not overwhelming, a reasonable trier of fact might fairly conclude upon the evidence that Klinge left the objects at the churches in reckless disregard of the risk of terrorizing and/or evacuation. Indeed, the evidence in the instant case is stronger than that in *Marsh, supra*. In that case, this court held that the prosecutor's repeated injection of her personal opinion concerning the defendant's guilt and the credibility of defense witnesses amounted to plain error in light of "the inconclusive evidence against Marsh, the particularly egregious misconduct of the prosecutor in presenting her personal views on the dispositive issues, and the lack of a prompt jury instruction specifically directed to the prosecutor's closing remarks[.]"

*Marsh*, 68 Haw. at 661, 728 P.2d at 1302–03. There, the evidence was inconclusive because the case turned essentially on the credibility of the victim versus the alibi witnesses. *Id.* at 661, 728 P.2d at 1302. Here, on the other hand, the prosecution adduced evidence strongly suggesting Klinge's reckless disregard of the risk of terrorizing and/or evacuation.

Therefore, in light of the nature of the prosecutor's statement, the failure of defense counsel to object, and the strength of the evidence against Klinge, we hold that any error with regard to this statement by the prosecutor did not prejudicially affect Klinge's substantial rights.

4. *Arguing to the jury that defense counsel would not tell "the whole story" because he had a "duty [to] get his client off"*

██ Klinge next asserts that the prosecutor committed misconduct by arguing that defense counsel concocted the defense of lack of state of mind because he had a "duty [to] get his client off." During closing arguments, the following exchange took place:

[PROSECUTOR]: The defense lawyer did not tell you that like he's taking everything out of context like he's not going to give you the whole story. *He's not going to give you the whole picture because he has a duty [to] get his client off.*

[DEFENSE COUNSEL]: Wait a minute. I object. That's carrying it too far.

THE COURT: I'll sustain that.

[DEFENSE COUNSEL]: I ask that it be stricken.

THE COURT: The last remark will be stricken.

(Emphasis added.)

Other courts have examined similar language used by the prosecution during closing argument with varying results. For example, in *Bell v. State*, 614 S.W.2d 122 (Tex. Crim.App.1981), the prosecutor argued during closing argument that "[the defense attorney's] duty is to see that his client gets off even if it means putting on witnesses who are lying." *Id.* at 123. The trial court sustained defense counsel's immediate objection and

instructed the jury that the prosecutor's comment was "not a correct statement of the law." *Id.* Defense counsel then requested a mistrial, which the trial court denied. On appeal, the *Bell* court held that the argument was clearly improper, and the instruction to disregard "was not sufficient to have removed the prejudice it created." *Id.* It further emphasized that "[t]he effect of [the prosecutor's] argument was to instruct the jury that only prosecuting attorneys seek to uphold truth and justice whereas defense counsel have a license to use any means to mislead the jury." *Id. See also Gomez v. State,* 704 S.W.2d 770, 771 (Tex.Crim.App. 1985) (en banc) (prosecutor's remark that defense counsel attempted "to manufacture evidence" and that "[defense counsel] is paid to get this defendant off the hook" warranted reversal of defendant's conviction because, taken together, the remarks "contained a clear accusation that [the defense] attorney would suborn perjury, if necessary, to accomplish his paid objective [and] . . . invited the jury to discredit [defendant's] defense[.]")

In *People v. Bell,* 49 Cal.3d 502, 262 Cal. Rptr. 1, 778 P.2d 129 (1989) (en banc), on the other hand, the California Supreme Court held that similar comments on the part of the prosecutor did not amount to plain error. In that case, during closing and rebuttal argument, the prosecutor commented:

> It's a very common thing to expect the defense to focus on areas which tend to confuse. That is—and that's all right, because that's [defense counsel's] job. If you're confused and you're sidetracked, then you won't be able to bring in a verdict. . . . It's his job to throw sand in your eyes, and he does a good job of it, but bear in mind at all times, and consider what [defense counsel has] said, that it's his job to get his man off. He wants to confuse you.

*Id.* at 538, 262 Cal.Rptr. at 21, 778 P.2d at 149. According to the California court, "to the extent that the remarks might be understood to suggest that counsel was obligated or permitted to present a defense dishonestly, the argument was improper." *Id.* at 538, 262 Cal.Rptr. at 21, 778 P.2d at 150. It also emphasized that counsel should neither mis-

state the law nor personally attack the integrity of opposing counsel. However, because an objection was not made by defense counsel, defendant's claim on appeal was deemed waived. *Id.*

Finally, in *People v. Gionis,* 9 Cal.4th 1196, 40 Cal.Rptr.2d 456, 892 P.2d 1199 (1995) (en banc), the prosecutor commented during closing argument that, among other things, the duty of an attorney is "to lie, conceal and distort everything and slander everybody," and that "[defense counsel]'s just doing his job. His job is to to [sic] get him off." The *Gionis* court held that the first remark was clearly improper, but taken in context, did not prejudice the defendant inasmuch as the trial court's prompt admonishment corrected any misconceptions conveyed to the jury. *Id.* at 1217, 40 Cal.Rptr.2d at 468, 892 P.2d at 1211. As to the second statement, it noted that, although defense counsel objected, he "did not do so on the basis that it could be misunderstood to suggest an improper meaning." *Id.* at 1218, 40 Cal.Rptr.2d at 469, 892 P.2d at 1212. As such, the prosecutor's conduct did not amount to reversible error. *See also Rodriguez v. Peters,* 63 F.3d 546 (7th Cir.1995) (prosecutor's comment that defense counsel's job was "to try to get his client off" did not deprive defendant of a fair trial inasmuch as defense counsel's objection to the remark was sustained, defense counsel rebutted the comment during his summation, the comment did not involve a disputed issue in the case, and the evidence against defendant was overwhelming); *U.S. v. Linn,* 31 F.3d 987, 993 (10th Cir.1994) (while "comments by prosecutors to the effect that a defense attorney's job is to mislead the jury in order to garner an acquittal for his client is not only distasteful but borders on being unethical[,]" and "should not be tolerated by either the trial judge or the bar," prosecutor's personal attacks on defense counsel during closing argument did not amount to plain error); *People v. Hawthorne,* 4 Cal.4th 43, 59–61, 14 Cal.Rptr.2d 133, 143–44, 841 P.2d 118, 128–29 (1992) (en banc) (prosecutor's comment "to the effect that law enforcement has an obligation to ascertain 'the true facts surrounding the commission of the crime' which defense counsel do not" potentially diverted the jury's attention from "the specifics upon

which they must focus," but, taken in context, was not so inflammatory to distract the jury from evaluation of the evidence), *certiorari denied,* 510 U.S. 1013, 114 S.Ct. 605, 126 L.Ed.2d 570 (1993). *Cf. Clark,* 83 Hawai'i at 305–06, 926 P.2d at 210–11 (where warranted by the evidence, prosecutor may comment during closing argument that the defendant or defense witnesses were lying).

In the instant case, the prosecutor's comment was clearly prosecutorial misconduct. The remark was uninvited and unsupported by any evidence in the record. Not only did the remark constitute an impermissible attack on defense counsel's integrity, but operated to denigrate the legal profession in general. We strongly disapprove of such reckless and unsupportable comments by the prosecutor. Indeed, the prosecutor's remark "lacked the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i." *Ganal,* 81 Hawai'i at 358, 917 P.2d at 389. *See also Clark,* 83 Hawai'i at 304, 926 P.2d at 199 ("a prosecutor's 'improper suggestions, insinuation, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'") (quoting *Marsh,* 68 Haw. at 661, 728 P.2d at 1302).

■ However, the trial court sustained defense counsel's immediate objection and then ordered the comment stricken from the record. Subsequently, during its charge to the jury, the trial court advised the jury that "[s]tatements or remarks made by counsel are not evidence."

We further note that the prosecutor's indecorous comment in this case was less egregious than those in *Marsh* or *Ganal.* In *Marsh,* the prosecutor, during summation, repeatedly stated her personal opinion that the defense witnesses had lied. 68 Haw. at 660, 728 P.2d at 1302. In *Ganal,* the defendant alleged fourteen instances of prosecutorial misconduct during closing argument. 81 Hawai'i at 374, 917 P.2d at 386. Here, the prosecutor's remark in this case was isolated and immediately stricken from the record by the trial court. Unlike many of the comments in *Ganal,* which were neither objected to nor cured by instruction, the prosecutor's

statement in this case drew an immediate objection that was sustained by the trial court. The jury was then instructed to disregard the remark.

Accordingly, in light of the nature of the statement, the prompt curative instruction, and the strength of the evidence against Klinge, *see supra* section III.B.4, we hold that his remark, though distasteful and unprofessional, was not so prejudicial as to deny Klinge a fair trial.

5. *Misstating the elements of terroristic threatening during rebuttal closing argument*

Klinge lastly submits that the prosecutor committed misconduct in misstating the material elements of terroristic threatening during rebuttal closing argument as follows:

[PROSECUTOR]: Now, counsel did say that there was a unanimity—and that's a word that's rarely used—unanimity instruction which means you can do one of three things—or I guess four things.

One is you find that the defendant acted recklessly and *he scared a lot of people.* You can find him guilty if you find he acted recklessly and *he caused evacuation of one or more building[s]* you can find him guilty.

Or the third option is if you find him guilty that *he scared people and evacuated building,* he's guilty. If you don't find of [sic] any of the three options, then he's not guilty of the first degree terroristic threatening.

If you find that he *might have evacuated only one building or scared only one person—*

[DEFENSE COUNSEL]: That misstates the law.

THE COURT: Let him finish.

[PROSECUTOR]:—is to be a common scheme, then he would be guilty of terroristic threatening in the second degree and not the first degree.

(Emphases added.)

■ This court has observed that "[a]rguments of counsel which misstate the law are subject to objection and to correction by

the court." *State v. Mahoe,* 89 Hawai'i 284, 290, 972 P.2d 287, 293 (1998). *See also State v. Kupihea,* 80 Hawai'i 307, 317, 909 P.2d 1122, 1132 (1996) ("improper comments by a prosecutor can be cured by the court's instructions to the jury and ... it will be presumed that the jury adhered to the court's instructions"). Here, it is clear that the prosecutor misstated the law when he informed that the jury that it could find Klinge guilty of terroristic threatening in the first degree if Klinge "scared a lot of people ... [or] caused evacuation of one or more building[s]."

 Nonetheless, we believe the instructions of the court in its charge to the jury, both before and after the presentation of evidence, remedied any potential harm to Klinge. Throughout the trial, the court made it clear to the jury that it was to apply the law as it was given to them by the court. Thus, in view of the court's proper instructions on terroristic threatening, Klinge fails to show that the prosecution's momentary misstatement of law amounts to reversible error.[16]

 We recognize "that there are situations in which. 'although no single prosecutorial act deprive[s] Defendant of a fair trial, the cumulative effect of the prosecutor's improper conduct [can be] so prejudicial as to deny him [or her] a fair trial.'" *State v. Pulse,* 83 Hawai'i 229, 244, 925 P.2d 797, 812 (1996) (quoting *State v. Pemberton,* 71 Haw. 466, 476, 796 P.2d 80, 85 (1990)) (brackets in original), *amended on reconsideration,* 83 Hawai'i 545, 928 P.2d 39 (1996). We believe, however, that the prosecutor's improper comments and misstatements of law, alone or in combination, did not substantially prejudice Klinge's right to a fair trial. Accordingly, we hold that the trial court did not abuse its discretion in denying Klinge's motion for mistrial based on prosecutorial misconduct.

16. Klinge also argues that the prosecutor committed misconduct in twice questioning Maui police officer Milton Matsuoka (Officer Matsuoka) whether any of the objects left by Klinge were perceived by others to be bombs. After the prosecutor asked the question once, defense counsel objected on the basis that it required speculation on the part of Officer Matsuoka. The trial court agreed and sustained the objection. After asking

## IV. CONCLUSION

For the foregoing reasons, we hold that (1) Klinge's constitutional right to a unanimous verdict was not violated inasmuch as HRS §§ 707–715(1) and (2) do not give rise to two separate and distinct crimes; and (2) the trial court did not abuse its discretion refusing to grant Klinge's motion for mistrial based on prosecutorial misconduct. Accordingly, we affirm the trial court's judgment, guilty conviction and sentence filed on December 3, 1997.

Concurring and Dissenting Opinion by RAMIL, J., with whom LEVINSON, J., Joins.

In my view, the Majority ignores Klinge's constitutional right to a unanimous verdict inasmuch as the two distinct mental state requirements described by HRS §§ 707–715(1) and 707–715(2) (1993) with respect to the results of conduct gave rise to two separate crimes. Indeed, the plain language and legislative history of HRS §§ 707–715(1) and 707–715(2) indicate that the legislature intended to create two separate crimes. By virtue of the statutory language, the requisite mental state under HRS §§ 707–715(1) and 707–715(2) is inextricably linked to two distinct results of the prohibited conduct that are statutorily described. Consequently, the prosecution must prove a defendant's requisite mental state not only with respect to the prohibited conduct, but also with respect to the statutorily described results of that conduct. In other words, to commit terroristic threatening, a defendant must act with either the intent or reckless disregard of terrorizing another person or the intent or reckless disregard of causing an evacuation. By adopting an amorphous federal due process test based on history and morality, the Majority effectively relieves the prosecution of its bur-

the question a second time, the court ordered Officer Matsuoka's answer stricken from the record. On balance, and in light of the trial court's prompt instruction to strike the answer from the record, the prosecutor's questions did not deny Klinge the right to a fair trial. Accordingly, the prosecutor's questioning did not amount to prosecutorial misconduct.

den to establish Klinge's intent in committing the threatening conduct. Because the Majority escapes the unavoidable conclusion that HRS §§ 707–715(1) and 707–715(2) create two separate crimes, I respectfully dissent from section III.A. of the Majority opinion.

A. *HRS § 707–715's Requisite Mental States With Respect to Two Distinct Results of the Prohibited Conduct Give Rise to Separate Crimes.*

1. *The Elements of An Offense*

HRS § 702–205 (1993) defines the "elements of an offense" as:

such (1) conduct, (2) attendant circumstances, and (3) *results of conduct,* as:

(a) *Are specified by the definition of the offense,* and

(b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

*Arceo,* 84 Hawai'i at 12, 928 P.2d at 855 (citing commentary on HRS § 702–205) (emphases added). In addition, despite the Majority's assertion that "juries need not agree on alternative means of establishing the mental state component possessed by the defendant," HRS § 701–114 requires proof beyond a reasonable doubt of each element of the offense, as well as of the requisite state of mind. *State v. Wallace,* 80 Hawai'i 382, 412, 910 P.2d 695, 725 (1996) (citing *Holbron,* 80 Hawai'i at 39, 904 P.2d at 924); *see also In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (citations omitted).

Moreover, HRS § 702–204 (1993) provides in relevant part that "a person is not guilty

of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense.". . . . HRS § 702–207 (1993) provides that *[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense,* without distinguishing among the elements thereof, *the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears."*

*Wallace,* 80 Hawai'i at 412, 910 P.2d at 725 (quoting *Holbron,* 80 Hawai'i at 39, 904 P.2d at 924) (some ellipsis points in original and some added) (brackets in original) (emphases added).

In light of the axiomatic principle that a crime consists of the prohibited conduct together with the requisite mental state, the Majority's assertion that "[t]he threatening conduct is what the law prohibits" is misguided.[1] Majority at 589, 994 P.2d at 521. Instead, HRS § 707–715 prohibits threatening conduct that is done with the requisite intent.

2. *The Language of HRS §§ 707–715(1) and (2) Describe Two Separate and Distinct Offenses.*

Although the Majority concedes that HRS § 707–715 "describes two alternative . . . states of mind applicable to that conduct[,]" the Majority maintains that "[e]ither intent gives rise to the same conduct and, therefore, the same crime." Majority at 585 & 589, 994 P.2d at 517 & 521. With this approach, I cannot agree. A review of the language of HRS §§ 707–715(1) and 707–715(2) reveals that the requisite mental states with respect

---

1. The Majority notes that "state of mind is not an 'element' of a criminal offense." Majority at 584 n. 3, 994 P.2d at 516 n. 3 (citing HRS § 702–205). As the above discussion illustrates, however, although state of mind is not an "element" of an offense, HRS § 702–207 provides that when "the definition of an offense specifies the state of mind sufficient for the commission of that offense . . ., the specified state of mind shall apply to all elements of the offense." I therefore emphatically disagree that "Klinge's approach 'rests on the erroneous assumption that any statutory alternatives are *ipso facto* independent elements

defining independent crimes . . . and [are] therefore subject to the axiomatic principle that the prosecution must prove independently every element of the crime.'" Majority at 587, 994 P.2d at 519. Although a defendant's requisite state of mind is not an actual "element" of a crime pursuant to HRS § 702–205, HRS §§ 701–114 and 702–207 mandate that the prosecution prove the existence of the specified state of mind with respect to each and every element of the charged offense. Indeed, a mere threat that is made without the intent or reckless disregard to terrorize or the intent or reckless disregard to cause an evacuation cannot constitute a crime.

to the distinct results described are so disparate as to give rise to separate crimes.

Under HRS § 707–715 (1993), a person commits the offense of terroristic threatening

> if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
>
> (1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, *another person;* or
>
> (2) With intent to cause, or in reckless disregard of the risk of *causing evacuation* of a building, place of assembly, or facility of public transportation.

(Emphases added.) Based upon the language of HRS §§ 707–715 and 707–716, the requisite state of mind with respect to the result of the prohibited conduct accompanying the offense of terroristic threatening in the first degree requires *either:* (1) under HRS § 707–715(1), intent to terrorize or reckless disregard of the risk of terrorizing another person; or (2) under HRS § 707–715(2), intent to cause or reckless disregard of the risk of causing the evacuation of a building. Therefore, HRS § 707–715 establishes separate and distinct means through which the prosecution can establish a defendant's requisite state of mind in committing the prohibited act.

To support a conviction based on HRS § 707–715(1), the prosecution must establish that the defendant had the intent to "terrorize" or recklessly disregarded the risk of terrorizing another person. Although the Hawai'i Penal Code (HPC) does not specifically define the term "terrorize," it is the verb form of the word "terror," which in turn is commonly understood as:

> Alarm; fright; dread; the state of mind induced by the apprehension of hurt from some hostile or threatening event or man-

ifestation; fear caused by the appearance of danger.

*Black's Law Dictionary* 1473 (6th ed.1990). Therefore, under HRS § 707–715(1), a person commits the offense of terroristic threatening if he or she engages in the prohibited conduct [2] with the attendant requisite state of mind to terrorize another person.

On the other hand, to support a conviction based on HRS § 707–715(2), the prosecution must establish that the defendant committed the prohibited conduct and that he or she did so with the intent to cause, or in reckless disregard of the risk of causing, evacuation of a building, place of assembly, or facility of public transportation. An "evacuation" is commonly understood as "any organized withdrawal or removal of persons from a place or area[,] especially as a protective measure[.]" Webster's Third New International Dictionary 786 (1961). HRS § 707–715(2) does not require that another person be placed in fear or apprehension.

Although the requisite states of mind requirements under HRS § 707–715 are not mutually exclusive, there is no doubt that their foci are distinct. *Compare* HRS § 707–720(1)(b) (1993) (requiring that the defendant kidnap with the intent to "use that person as a shield or hostage") *with* HRS § 707–720(1)(e) (1993) (requiring that the defendant kidnap with the intent to "terrorize that person or a third person"). While HRS § 707–715(1) requires an intent to cause, or a reckless disregard of the risk of causing, *terror in another person,* HRS § 707–715(2) merely requires an intent to cause, or a reckless disregard of the risk of causing, an *evacuation of an enumerated place,* regardless of any perceived fear.

Indeed, the Majority concedes "that not all evacuees experience fear in response to a command to evacuate." [3] Majority at 588 n.

---

**2.** The conduct prohibited required by HRS § 707–715 encompasses threatening, by word or conduct, to (1) cause bodily injury to another person, (2) cause serious damage to property of another, or (3) commit a felony.

**3.** Although the distinct mental states created by HRS §§ 707–715(1) and (2) are not mutually exclusive (*i.e.,* a defendant may simultaneously intend to terrorize a person and to cause an

evacuation), it does not follow that a defendant who intends to cause an evacuation would necessarily intend to terrorize a person, or vice versa. Indeed, a person evacuating an area may have done so because he or she was ordered to do so and may not even know the reason why he or she is being ordered to evacuate. Therefore, I cannot agree with the prosecution's argument and the Majority's suggestion that the mental state in HRS § 707–715(2) (to cause an evacuation) is

7, 994 P.2d at 520 n. 7. Similarly, not all threats made with the intent or reckless disregard of causing an evacuation are made with the intent or reckless disregard of causing fear. Had the legislature intended to create a single offense as opposed to separate offenses, the legislature would not have enacted HRS § 707–715(2) as a separate subsection. Ironically, although the legislature must have realized that "the evacuation of a building in almost all situations involves fear on the part of at least some of the evacuees," the legislature created a separate subsection for defendants who did not possess the intent to terrorize another person but who possessed the intent to cause an evacuation.[4] Because we must presume that the legislature was aware that the two alternatives will, in many cases, be coextensive, we must read HRS § 707–715 to give effect to all parts of the statute, including the two statutory alternatives described by HRS §§ 707–715(1) and (2). *See, e.g., In re Doe,* 90 Hawai'i 246, 250, 978 P.2d 684, 688 (1999) (citations omitted) ("[C]ourts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute.") Because the Majority ignores the legislative intent to create two separate offenses, the Majority's position renders HRS § 707–715(2) superfluous. Therefore, I am led to the inescapable conclusion that the legislature intended to create two separate crimes by promulgating a separate subsection for threats made with the intent or reckless disregard of causing an evacuation.

3. *The Legislative History Reveals Two Separate and Distinct Concerns Underlying HRS §§ 707–715(1) and 707–715(2)*

The Majority also acknowledges that the legislature had different reasons for enacting two separate provisions setting forth two separate mental states that are inextricably linked to the statutorily described results of

conduct. Yet, the Majority ignores the distinct concerns associated with the enactment of the two distinct requisite mental states by reasoning that "[t]he threatening conduct is what the law prohibits." With this approach, I emphatically disagree. In my view, the legislative history of HRS § 707–715 compels the conclusion that the legislature intended to create two separate crimes by creating two distinct requisite mental states.

Undoubtedly, the legislature enacted HRS § 707–715 for two distinct reasons. First, HRS § 707–715(1) addresses conduct causing serious alarm for personal safety. *See* Commentary to HRS § 707–715. The legislature recognized this danger for two reasons.

(1) It is easily seen that people who are attempting to avoid what they believe to be a serious harm may often take action so precipitous as to harm themselves. Where the actual harm occurs, the threatener may be guilty of a more serious offense. But where the harm does not occur, this section permits conviction for the inchoate threat.

(2) The civil law has come to recognize the validity of psychological trauma; recovery may now be had for the intentional infliction of such injury even though the conduct of the offender had no physical connection with the victim. If such conduct constitutes a recognized substantial danger, it follows that a penal sanction may appropriately be imposed for conduct which intentionally or recklessly creates the danger.

*Id.* Based upon this language, the harm, *i.e.,* the result of conduct, sought to be prevented by HRS § 707–715(1) is the psychological trauma of the victim of a terroristic threat. Therefore, under HRS § 707–715(1), the offense of terroristic threatening is "an offense against the *individual* of substantial magnitude and danger, even allowing for the lack of any actual harm." *Id.* (emphasis added).

In contrast, HRS § 707–715(2) addresses conduct disrupting *public* services or activi-

---

subsumed in HRS § 707–715(1) (to terrorize another person).

4. Certainly, I see no other reason why the legislature would divide the two alternatives into separate subsections. Indeed, the Majority fails to address this issue.

ties. *See* Commentary to HRS § 707–715. With regard to HRS § 707–715(2), the legislature intended to discourage activities that would result in the evacuation of a place or building by imposing penal sanctions. *Id.* In so doing, the legislature recognized "the magnitude of the inconvenience and attendant dangers involved in the disruption of *public* services." *Id.* (emphasis added). Therefore, unlike HRS § 707–715(1), which seeks to address a victim's psychological trauma that results from a threat intended to terrorize, HRS § 707–715(2) seeks to address the public inconvenience that results from an evacuation regardless of the reason for the threat.

Given the different purposes for which HRS §§ 707–715(1) and 707–715(2) were enacted, it is unmistakable that the legislature intended to address distinct concerns in enacting HRS §§ 707–715(1) and 707–715(2). *A fortiori,* HRS §§ 707–715(1) and 707–715(2) plainly describe distinct results of the prohibited conduct. Given the distinct concerns underlying HRS §§ 707–715(1) and 707–715(2), the legislature enacted HRS § 707–715(2) to prevent the disruption of public services and to address threats that involve public safety, such as what is commonly known as a "bomb threat." In contrast, given that the legislature enacted HRS § 707–715(1) to prohibit threats against individuals, HRS § 707–715(1) implicitly addresses threats that are more personal in nature, such as threats of harm directed towards individuals as opposed to the public.

Based upon a reading of the statutory language together with the legislative history, HRS §§ 707–715(1) and 707–715(2) prohibit the making of a threat with the intent to cause a specified result of the threat. In other words, HRS §§ 707–715(1) and 707–715(2) prohibit not only a certain course of conduct but also the intent to cause a certain

result of the prohibited conduct. A mere threat that is made without the requisite mental state does not constitute a crime. By virtue of the statutory language, the requisite mental state for the offense of terroristic threatening is inextricably linked to two distinct results of the prohibited conduct. The prosecution must prove the requisite mental state not only with respect to the prohibited conduct, but also with respect to the defendant's intent to bring about the statutorily described *results* of that conduct. Because HRS §§ 707–715(1) and 707–715(2) inextricably links the requisite mental state with the intent to cause two distinct *results,* HRS §§ 707–715(1) and 707–715(2) create two distinct offenses. Accordingly, the mental states with respect to the result of the prohibited conduct under HRS §§ 707–715(1) and 707–715(2) give rise to separate and distinct criminal offenses.

The Majority relies on the axiomatic principles that "the offender need not cause a result" and that actual terrorization or an actual evacuation is not a material element of the offense. Majority at 585, 994 P.2d at 517. The Majority, however, fails to note that the defendant *must* possess the requisite intent at the time he or she engages in threatening conduct. In other words, a defendant who intentionally, knowingly, or recklessly engages in threatening conduct without the intent to terrorize or to cause an evacuation cannot be guilty of the offense. The defendant must intend to bring about a *result*—either to "terrorize" or to "cause evacuation." Because the statute connects the requisite mental state together with the intent to cause one of two distinct and separate results (*i.e.,* to terrorize or to cause an evacuation), I can only conclude that HRS §§ 707–715(1) and 707–715(2) give rise to separate and distinct criminal offenses.[5]

---

5. In *United States v. UCO Oil Co.,* 546 F.2d 833 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), the United States Court of Appeals for the Ninth Circuit considered the issue whether a criminal statute describes a single offense or multiple offenses. *See also State v. James,* 698 P.2d 1161, 1165 (Alaska 1985), and *United States v. Shorter,* 608 F.Supp. 871, 877 (D.C.Cir.1985) (adopting the test in *UCO Oil*). In so doing, the Ninth Circuit articulated the following four factors: (1) the

language of the statute; (2) the legislative history; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishment for the conduct charged in the indictment. In this case, as discussed above, at least three of the four *UCO Oil* factors (*i.e.,* the statutory language, the legislative history, and the nature of the misconduct) clearly indicate that HRS §§ 707–715(1) and (2) describe two separate offenses. Without explanation, however, the Majority re-

B. *The Right to a Unanimous Verdict as to Each Separate Criminal Offense and the Constitutional Mandate Requiring a Unanimous Verdict as to the Crime Committed*

Given that HRS §§ 707–715(1) and 707–715(2) create two distinct criminal offenses upon which the jury can convict an accused of terroristic threatening, I fail to see why the jury instructions should not require the jury to agree on one of the alternative crimes. We have previously held that "the right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawaiʻi Constitution." *Arceo,* 84 Hawaiʻi at 30, 928 P.2d at 872 (citation omitted). Despite Klinge's constitutional right to a unanimous verdict with respect to the crime he committed, the Majority applies the analysis and reasoning of the plurality opinion of the United States Supreme Court in *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).[6] However, *Schad* did not involve the issue of whether the jury must unanimously agree on the crime committed by a defendant.

Instead, *Schad* involved the single crime of murder with two alternative states of mind, *i.e.,* premeditated murder and felony murder as first-degree murder. Schad was prosecuted and convicted in Arizona for first-degree murder, based upon premeditated murder and felony murder theories, and sentenced to death. *Id.* at 629, 111 S.Ct. 2491. On appeal, the Arizona Supreme Court affirmed the conviction and rejected Schad's contention that the jury was required to agree on a single theory of first-degree murder. *Id.*

The United States Supreme Court granted certiorari and affirmed the conviction. *Id.* at 648, 111 S.Ct. 2491. A plurality of the Court

framed the issue as whether it was permissible under the due process clause of the fourteenth amendment to the United States Constitution for the State of Arizona to define both premeditated murder and felony murder as first-degree murder. *Id.* at 630–31, 111 S.Ct. 2491. The *Schad* Court began with the general rule that decisions as to whether facts are material, and thus must be proved individually as essential elements, or immaterial, serving only as the means of satisfying an essential element, are decisions that are most appropriately left to the states. *Id.* at 636, 111 S.Ct. 2491 (citing *Mullaney v. Wilbur,* 421 U.S. 684, 690–91, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). The plurality then recognized that the Court did not have the authority to substitute its construction of a state statute for that of the Arizona Supreme Court and noted:

> by determining that a general verdict as to first-degree murder is permissible under Arizona law, the Arizona Supreme Court has effectively decided that, under state law, premeditation and the commission of a felony are not independent elements of the crime, but rather mere means of satisfying a single *mens rea* element. The issue in this case therefore is not whether "the State must be held to its choice," ... *for the Arizona Supreme Court has authoritatively determined that the State has chosen not to treat premeditation and the commission of a felony as independent elements of the crime, but rather whether Arizona's choice is unconstitutional.*

*Id.* at 637, 111 S.Ct. 2491 (emphasis added). Nevertheless, the plurality recognized that there was a point beyond which a state cannot, consistent with the due process clause, relieve itself of the burden of proving certain

---

fuses to apply the *UCO Oil* test. Instead, the Majority adopts an amorphous test based upon historical practice and the degree of moral blameworthiness and culpability.

6. The Court's decision in *Schad* with respect to the issue of a defendant's right to a unanimous verdict was split 4–1–4. Justice Souter, joined by Chief Justice Rehnquist, and Justices O'Connor and Kennedy, authored the plurality opinion. Justice Scalia concurred in the plurality's result but used a substantially different analysis than that used by the plurality. *Id.* at 648–52, 111

S.Ct. 2491. Justice White, joined by Justices Marshall, Blackmun, and Stevens, dissented. *Schad,* 501 U.S. at 652–62, 111 S.Ct. 2491. Therefore, the Majority's adoption of the *Schad* test is an adoption of a test approved by only four members of the United States Supreme Court. In any event, the test set forth in *Schad* is inapplicable inasmuch as the *Schad* Court did not consider the question whether felony murder and premeditated murder are so disparate as to constitute separate crimes.

facts. *Id.* at 636–37, 111 S.Ct. 2491. According to the plurality, the appropriate test under the due process clause measures the state action against the due process requirement of fundamental fairness, as evidenced both by historical and current practice, and by a sense of culpability. *Id.* at 637, 111 S.Ct. 2491.

In the *Schad* plurality's opinion, equating premeditation with the commission of a felony as mental states of comparable culpability for first-degree murder found "substantial historical and contemporary echoes." *Id.* at 640, 111 S.Ct. 2491. On this basis, the plurality noted that Arizona's practice of equating the two means was presumptively likely to meet the criterion of fundamental fairness. *Id.* at 642, 111 S.Ct. 2491 (citing *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).

Although the plurality was unwilling to establish a bright-line test for determining whether alternative means of satisfying a *mens rea* element are materially different, it noted that the alternative mental states had to "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 643, 111 S.Ct. 2491. Using this standard, the plurality determined that, because robbery-murder and premeditated murder could be considered equivalently culpable, Arizona's practice satisfied the due process requirements. *Id.* at 644, 111 S.Ct. 2491. However, the plurality conceded that, although greater jury specificity was probably a sound idea, "the Constitution did not command such a practice on the facts of this case." *Id.* at 645, 111 S.Ct. 2491.[7]

*Schad* is inapposite to this case. The *Schad* plurality based its analysis on the Arizona Supreme Court's authoritative determination that "premeditation and the commission of a felony are not independent elements of ... [first-degree murder], but rather are mere means of satisfying a single [requisite mental state]." *Id.* at 637, 111 S.Ct. 2491. Given the Arizona Supreme Court's determination, the *Schad* plurality reasoned that the jury did not need to reach agreement between premeditation and the commission of a felony because it was merely a preliminary factual issue underlying the verdict (*i.e.,* the same crime). In contrast, the issue in this case does not involve whether a state can constitutionally define both premeditated murder and felony murder as the same crime, but rather whether a jury must agree on whether a defendant committed the same crime.

As discussed, the statutorily described results of the prohibited conduct set forth by HRS §§ 707–715(1) and 707–715(2) are separate and distinct. In contrast, because the end result in *Schad* was the death of a person, the plurality recognized that it was confronted with the issue of "alternative mental states." In this case, we are not faced with the "alternative mental states" issue involving the same crime, but rather the issue of two separate crimes each with distinct statutorily described results of the prohibited conduct.

Indeed, the differences between the intent to cause terror in another person and the intent to cause an evacuation preclude the conclusion that the mental states in HRS §§ 707–715(1) and 707–715(2) are mere means of satisfying a single mental state requirement. In other words, inasmuch as HRS §§ 707–715(1) and 707–715(2) each describe a different result of the prohibited conduct, the mental state with respect to that result must be proved to have accompanied the prohibited conduct as an essential ele-

---

**7.** In a dissenting opinion, four of the Justices expressed disagreement with the plurality's framing of the issue. 501 U.S. at 652, 111 S.Ct. 2491. According to the dissent, the plurality mischaracterized the constitutional issue by focusing on whether premeditated murder and felony murder were permissibly alternative ways of establishing first-degree murder. *Id.* at 653–54, 111 S.Ct. 2491. The true issue, the dissent argued, was whether it is permissible for a jury to convict a defendant of one crime on alternative theories "possessing no [essential] elements in common except the fact of a murder." *Id.* at 654–55, 111 S.Ct. 2491. Conviction on these alternative theories, the dissent concluded, would allow an impermissible mixing and matching of essential elements. *Id.* According to the dissent, the plurality's holding would allow a defendant to be convicted of first-degree murder by a jury in which six jurors are convinced that the elements of felony murder have been proved, and six are convinced that the elements of premeditated murder have been proved. *Id.*

ment. HRS § 702–207 ("[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense, ..., the specified state of mind shall apply to all elements of the offense[.]").

Given that the requisite mental states with respect to the result of the prohibited conduct created by HRS §§ 707–715(1) and 707–715(2) essentially result in two separate crimes, the issue in this case does not involve, as it did in *Schad*, "preliminary" facts that serve only as the means of satisfying an essential element. Instead, the issue in this case is whether a criminal defendant has been afforded the protection of article I, sections 5 and 14 of the Hawai'i Constitution, which guarantees a unanimous verdict in a criminal prosecution, where there is a possibility that a jury can return a guilty verdict on two separate crimes. Therefore, I find the analysis and reasoning of the plurality opinion in *Schad* simply inapplicable to this case.[8]

## C. *Election of Specific Mental State and the "Specific Unanimity" Instruction*

The Majority's approach in this case is inconsistent with this court's decision in *Ar-*

ceo, *supra*, in which we recognized a criminal defendant's right to a unanimous verdict with respect to the prohibited conduct element of the charged offense. 84 Hawai'i at 14, 928 P.2d at 856 (quoting *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725 (quoting *Holbron*, 80 Hawai'i at 39, 904 P.2d at 924); *see also Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999) (noting that "crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime.... Calling a particular kind of fact an 'element' carries certain legal consequences. The consequence that matters for this case is that a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element" (citations omitted)); *Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) (holding that "[i]n criminal cases[,] this requirement of unanimity extends to all issues ... which are left to the jury"). Arceo was charged with one count of sexual assault in the third degree and one count of sexual assault in the first degree for acts occurring between August 16, 1989 and May 4, 1990.

---

**8.** Notwithstanding that HRS §§ 707–715(1) and 707–715(2) set forth two distinct criminal offenses, the Majority is content in adopting the amorphous standard based upon "notions of equivalent blameworthiness or culpability" and "history and wide practice as guides to fundamental values" that was applied in *Schad*. Majority at 586–589, 994 P.2d at 516, 519. The Majority fails to note, however, that the plurality in *Schad* gave great deference to the Arizona Supreme Court in defining the elements of a crime enacted by the Arizona legislature. As the *Schad* plurality observed,

> It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government ... and that we should not lightly construe the [United States] Constitution so as to intrude upon the administration of justice by the individual States.

*Id.* at 638, 111 S.Ct. 2491 (quoting *Patterson v. New York*, 432 U.S. 197, 201, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)) (brackets added) (citation omitted).

In contrast, we are under no duty to give deference in interpreting the Hawai'i Constitution. *See, e.g., Arceo*, 84 Hawai'i at 11, 928 P.2d at 853 (citations omitted) (noting that "we review questions of constitutional law 'by exercising our own *independent* constitutional judgment'"

(quoting *Trainor*, 83 Hawai'i at 255, 925 P.2d at 823, and *Lee* 83 Hawai'i at 273, 925 P.2d at 1097) (emphasis added)). Unlike *Schad*, which focused on the limits of a state's power to define a crime, we are faced with the issue whether a generic verdict that could have been based on separate and distinct crimes violated Klinge's right to a unanimous verdict as guaranteed under article I, sections 5 and 14 of the Hawai'i Constitution. As we have long recognized, this court, "as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution," is under no duty to accord deference to the United States Supreme Court in matters calling for the interpretation of the Hawai'i Constitution. *See Arceo*, 84 Hawai'i at 28, 928 P.2d at 870 (citations omitted).

Given these well settled principles, I fail to see how the "analysis and reasoning" of *Schad*, which the dissent acknowledges is not controlling, can be "particularly persuasive here," especially in light of the following: (1) the statute that was examined in *Schad* is unlike our terroristic threatening statute; and (2) even the *Schad* plurality conceded that greater jury specificity was desirable, although, in the *Schad* plurality's view, the federal constitution "did not command such a practice on the facts" in light of a state's power to define a crime. Majority at 588, 994 P.2d at 518.

*Arceo,* 84 Hawai'i at 4–5, 928 P.2d at 846–47. The complaining witness alleged two specific acts of sexual contact and five specific acts of sexual penetration as the bases of the charges. *Id.* at 7–9, 928 P.2d at 849–51. Arceo was convicted of both counts and appealed. *Id.* at 10, 928 P.2d at 852.

This court vacated Arceo's convictions on the grounds that, when separate and distinct culpable acts are subsumed within a single count charging a sexual assault—any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.,* an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt. *Id.* at 32–33, 928 P.2d at 874–75.

In contrast to the present case, which involves the requisite state of mind with respect to the statutorily described results of the prohibited conduct, *Arceo* addressed a situation involving separate and distinct culpable acts subsumed within a single count. However, given that a criminal defendant is guaranteed a unanimous verdict as to each element of the crime, I see no reason why the principles discussed in *Arceo* should not apply to this case. As the Oregon Supreme Court observed:

> *There is no basis for distinguishing between jury agreement on the act required for criminal liability and on the mental element that makes the act culpable.* The act and the culpable mental state are equally essential for any crime that requires a culpable mental state. Of course jurors cannot convict a defendant if they unanimously agree that he intended to kill a person but only half believe he did so. No more can they convict if they unanimously agree that a defendant's act caused a person's death but only half believe that he acted intentionally. The same is true if jurors agree that a defendant's act caused a person's death but do not agree that the defendant committed a felony, or vice versa.

*Oregon v. Boots,* 308 Or. 371, 780 P.2d 725, 728 (1989) (en banc) (emphasis added) (citations omitted).[9]

As in *Arceo,* where the prosecution set out to obtain a conviction through separate and distinct culpable acts subsumed in a single count, the prosecution in this case set out to convict Klinge of terroristic threatening in the first degree by either of two different paths: (1) that Klinge intended to terrorize or recklessly disregarded the risk of terrorizing; *or* (2) that Klinge intended to cause or recklessly disregarded the risk of causing an evacuation. Therefore, I would hold that a criminal defendant's constitutional right to a unanimous verdict is violated *where the requisite mental states with respect to the result of the prohibited conduct are so disparate as to constitute separate and distinct crimes,* unless the circuit court either: (1) requires the prosecution, at the end of its case-in-chief, to elect the specific mental state with respect to the particular result of the prohibited conduct upon which it is relying; or (2) gives a specific unanimity instruction with regard to the defendant's requisite state of mind as to the result of the prohibited conduct.

Turning to the present case, the circuit court instructed the jury with regard to the

9. The Supreme Court of Washington has also rejected the *Schad* rationale. In *State v. Golladay,* 78 Wash.2d 121, 470 P.2d 191 (1970), the defendant was charged with first-degree murder committed either with premeditation or in the course of a felony. *Id.* at 193. The court first declared that the two "means of committing the crime [were] but alternative constituents of the same statutory offense; they [did] not constitute separate and distinct offenses." *Id.* at 200. Nevertheless, the court held that the jury instructions "*must clearly distinguish the alternative theories and require the necessity for a unanimous verdict on either of the alternatives.*" *Id.* at 201. *See also State v. Murray,* 308 Or. 496, 782 P.2d 157 (1989). In any event, no court has addressed the issue of whether the disparate mental state elements give rise to separate crimes with respect to terroristic threatening.

offense of terroristic threatening in the first degree as follows:

A person commits the offense of terroristic threatening in the first degree, if with intent to terrorize, or in reckless disregard of the risk of terrorizing another person, *and/or* with intent to cause or in reckless disregard of the risk of causing the evacuation of a building, place of assembly, or facility of public transportation by threats made in a common scheme against different persons, he did threaten by word or conduct to cause bodily injury to another person or serious damage to the property of another.

There are five material elements of the offense of terroristic threatening in the first degree each of which the prosecution must prove beyond a reasonable doubt.

These five elements are:

1. That during or about the period of March 21, 1997, through April 7, 1997;

2. In the County of Maui, State of Hawaii;

3. [Defendant] . . .;

4. In a common scheme against different persons[;]

5. Threatened, by word or conduct, to cause bodily injury to another person or serious damage to property of another:

(1) *With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person [HRS 707–715(1)]; or*

(2) *With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation [HRS 707–715(2)].*

(Emphases added.) Based upon the language of this instruction, the circuit court gave the jury a choice between two separate and distinct crimes inasmuch as the requisite mental state element is inextricably linked to the two distinct statutorily described results of the prohibited conduct. Specifically, to convict Klinge, the jury would have had to agree either: (1) that Klinge acted with the intent to terrorize or recklessly disregarded the risk of terrorizing another person; *or* (2) that Klinge acted with the intent to cause or recklessly disregarded the risk of causing the evacuation of a building.[10]

Because the prosecution can rely on either statutorily described result of conduct to establish the mental element of the offense, HRS § 707–715 creates the possibility of "patchwork" jury agreement. In other words, because the jury was given the choice between two distinct results of conduct with respect to the mental state element, either of which could have resulted in a guilty verdict, it is unclear whether the jury in this case was in unanimous agreement as to which crime Klinge allegedly committed. Based upon the record in this case, it is impossible to determine whether the jury was in unanimous agreement regarding the crime Klinge allegedly committed. It is possible that six of the twelve jurors believed that Klinge committed the crime of threatening with the intent to terrorize or recklessly disregarded the risk of terrorizing another person, while the other six jurors believed that Klinge committed the crime of threatening with the intent to cause an evacuation or recklessly disregarded the risk of causing an evacuation.

The Majority asserts that "either intent results in the same conduct and the same crime" because "[t]he threatening conduct is what the law prohibits." [11] I find this propo-

---

**10.** Although the circuit court gave to the jury a unanimity instruction with regard to the prohibited conduct allegedly committed by Klinge, the language of the instruction failed to instruct the jury that all twelve jurors must unanimously agree that the requisite mental state with respect to the same statutorily described result had been proven beyond a reasonable doubt. The unanimity instruction read as follows: "All 12 jurors must unanimously agree that the same underlying criminal act or acts have been proven beyond a reasonable doubt." Because the jury in this case was not instructed that it had to unanimous-

ly agree on the requisite mental state with respect to the same statutorily described result, we cannot assume that the jury unanimously agreed on Klinge's mental state.

**11.** As discussed, HRS §§ 707–715(1) and (2) contemplate different results of conduct and address different types of threats (*i.e.*, different types of prohibited conduct). Suppose, for example, that a threat of personal harm is made to an individual who is outdoors with no buildings, places of assembly, or facilities of public transportation in the vicinity. In such a case, it would be extreme-

sition untenable. The prosecution must prove beyond a reasonable doubt the requisite mental state not only with respect to the prohibited conduct, but also with respect to the statutorily described results of that conduct. In this regard, HRS §§ 707–715(1) and 707–715(2) describe distinct results of the prohibited conduct with which the requisite state of mind component of the crime is inextricably linked. Therefore, HRS §§ 707–715(1) and 707–715(2) describe two distinct offenses.

In this case, to convict Klinge, the jury needed to agree not only that Klinge committed a threat, but also that Klinge committed the threat with the requisite intent. Because the statute describes the requisite mental state with respect to distinct results of conduct, HRS § 707–715 creates two separate crimes: (1) a threat made with the intent or reckless disregard of the risk to terrorize another person; and (2) a threat made with the intent or reckless disregard to cause an evacuation. The only common element between the two alternatives is a threat. Although the two alternatives may, in some cases, share a common prohibited act, it does not follow that they constitute the same offense for purposes of article I, sections 5 and 14 of the Hawai'i Constitution. Because the requisite mental state with respect to the result of the prohibited conduct is an equally important component of the crime, the two alternatives must share in common the same elements (*i.e.*, the same prohibited act and mental state with respect to the result of the act) to constitute a single crime.

Given Klinge's constitutional right to a unanimous verdict, I would hold that Klinge was entitled to know whether the jury found that he committed the acts charged with either: (1) the intent to terrorize or reckless disregard of the risk of terrorizing another person; or (2) the intent to cause or reckless disregard of the risk of causing an evacuation. Indeed, as one commentator has noted:

> A patchwork jury will, of course, always agree on the legal conclusion that the statute has been violated, and, if the patchwork verdict is arguably proper, one will always find that the jury has also agreed on at least one concrete historical fact relating to the crime. Thus the [prohibited conduct] and *corpus delicti* requirements will be formally satisfied. However, such minimal compliance does not satisfy the reasonable doubt standard. The jury is valued not only as a community buffer between the accused citizen and oppressive overzealous law enforcers, but also as a guarantor that the stigma of conviction will not be attached except on clear proof of specific conduct.

Hayden J. Trubitt, *Patchwork Verdicts, Different–Jurors Verdicts, and American Jury Theory: Whether Verdicts Are Invalidated by Juror Disagreement on Issues,* 36 Okla. L.Rev. 473, 530–31 (1983). Because patchwork jury agreement does not guarantee a criminal defendant's constitutional right to a unanimous verdict, I believe that the circuit court erred in giving an instruction that allowed a choice between what essentially were two separate crimes.[12]

---

ly difficult to infer that the person making the threat intended to cause an evacuation. Yet, a generic verdict under HRS § 707–715 that was based on instructions with no unanimity instructions would, in effect, be a conclusion that the person making the threat could have had intended to cause an evacuation. In such a case, it would be critical to know whether the person making the threat intended to cause terror in another person or an evacuation because it would be unlikely that a finding that the person intended to cause an evacuation could be upheld in such a case. It is therefore erroneous to assume that HRS §§ 707–715(1) and (2) address the same prohibited results of conduct.

12. I do *not* suggest that "the jury ... should have been required to unanimously find one of each of the following alternatives: "that Klinge threat-

ened by 'word *or* conduct, to cause bodily injury to another person *or* serious damage to property of another *or* to commit a felony,' and that Klinge performed the act 'with the intent to terrorize *or* in reckless disregard of the risk of terrorizing,' *or* 'with intent to cause *or* in reckless disregard of the risk of causing evacuation.'" Majority at 591, 994 P.2d at 521 (emphases in original). By focusing on the mere presence of the word "or" in a statute, the Majority misconstrues the dispositive issue in this case. It is elementary that the mere presence of the word "or" in a statute would *not, in and of itself,* implicate a criminal defendant's right to a unanimous verdict. I merely suggest that a criminal defendant's constitutional right to a unanimous verdict is implicated where a statute describes separate and distinct crimes inasmuch as the jury would need to unanimously agree as to

## D. CONCLUSION

For the reasons discussed above, I respectfully dissent from section III.A. of the Majority opinion.

Concurring and Dissenting Opinion by
LEVINSON, J.

I fully agree with the analysis set forth in Justice Ramil's concurring and dissenting opinion and therefore dissent from section III.A. of the majority opinion. I also believe, as did the dissenters in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), under circumstances sufficiently analogous to render the observation apt in the present case, that the majority "misses the mark in attempting to compare this case to those in which the issue concern[s] proof of facts regarding the particular means by which a crime was committed." 501 U.S. at 656, 111 S.Ct. 2491 (White, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting). Accordingly, in my view, the majority's statutory construction of HRS §§ 707–715(1) and (2) "is not only mistaken, but also undermines the integrity of the conceptual approach to criminal liability incorporated in the HPC [*i.e.*, the Hawai'i Penal Code]." *State v. Buch*, 83 Hawai'i 308, 324, 926 P.2d 599, 615 (1996) (Levinson, J., joined by Klein, J., concurring and dissenting). That being so, and "[b]ecause the HPC is a fragile organism that is subject to abuse and requires vigilant protection, I have no choice but to address some of the implications of the court's decision in this matter." *Id.* (Levinson, J., joined by Klein, J., concurring and dissenting) (footnote omitted).

For most of the reasons ably covered by Justice Ramil, I believe that the majority does violence the following

> rules of statutory construction to which this court has consistently adhered. First, the fundamental starting point for statutory interpretation is the language of the statute itself.

Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.

Third, implicit in the task of statutory construction is our foremost obligation, namely, to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.

....

Stated most obliquely, this court subscribes to the "well settled" rule that where there is no ambiguity in the language of a statute, *and the literal application of the language would not produce an absurd or unjust result,* clearly inconsistent with the purposes and policies of the statute, there is no room for judicial construction and interpretation, and the statute must be given effect, according to its plain and obvious meaning. Similarly, departure from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given the language.

Stated more directly, even absent statutory ambiguity, departure from literal construction is justified *when such construction would produce an absurd and unjust result* and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act.

*Id.* at 324–26, 926 P.2d at 615–17 (Levinson, J., joined by Klein, J., concurring and dissenting) (citations, quotation signals, brackets, and footnote omitted) (emphases in original).

The work product of the foregoing violence is a construction of HRS §§ 707–715(1) and (2) that, in my opinion, "is unjust, absurd, and transforms the HPC into 'a rope of sand which perishes in the twisting.'" *Id.* at 334, 926 P.2d at 625 (Levinson, J., joined by

---

which crime was committed. Therefore, I would hold that a criminal defendant's constitutional right to a unanimous verdict is violated *where the requisite mental state with respect to the result of the prohibited conduct are so disparate as to constitute separate and distinct crimes,* unless the circuit court either: (1) requires the prosecution,

at the end of its case-in-chief, to elect the specific mental state with respect to the particular result of the prohibited conduct upon which it is relying; or (2) gives a specific unanimity instruction with regard to the defendant's requisite state of mind as to the result of the prohibited conduct.

Klein, J., concurring and dissenting) (quoting R.W. Emerson, "Politics," *Essays: Second Series* (1844), *reprinted in Complete Works of Ralph Waldo Emerson* 3:199 (1903), *reprinted in* F. Shapiro, *The Oxford Dictionary of American Legal Quotations* 294 (1993)).